**SANKIN**

v.

**5410 CONNECTICUT AVENUE
CORPORATION et al.**

**BENN**

v.

**GARFIELD.**

Civ. A. Nos. 1493–59, 4002–60.

United States District Court
District of Columbia.

Jan. 18, 1968.

Edward L. Genn, Washington, D. C., for plaintiff Sankin.

Vail W. Pischke, Falls Church, Va., for defendant 5410 Connecticut Avenue Corporation and intervenor-defendant Pardo.

William H. Deck, Washington, D. C., for defendant James T. Benn.

Benjamin W. Dulany, Washington, D. C., for defendants Joseph A. Garfield and Janet Garfield.

John A. Beck, Washington, D. C., for intervenor-defendants Whiting, Betoff, Winn and Aileen A. Link, Executrix of the Estate of Harry W. Link.

Joseph Pardo, Miami, Fla., pro se.

## OPINION

WILLIAM B. JONES, District Judge.

This multiclaim action resulted from certain fraudulent dealings with respect to an apartment house property situated in the District of Columbia. At issue are the claims asserted by plaintiff Sankin in his complaint against all defendants in Civil Action No. 1493–59; claims asserted in a complaint in intervention; and claims asserted in two counterclaims, four cross-claims and plaintiff Benn's complaint in Civil Action No. 4002–60.[1]

1. Civil Action No. 4002–60 was consolidated with Civil Action No. 1493–59 since, except for the party defendant (Janet Garfield), it involved common questions pending before the Court in James Benn's cross-claim against Joseph Garfield in Civil Action No. 1493–59.

From the evidence adduced at the trial of these actions I find the following facts:

Plaintiff Julius Sankin (Sankin) and defendant Joseph Garfield (Garfield) are related through marriage; Herman Mankes (not a party) being Garfield's uncle and Sankin's father-in-law. Prior to 1956, Mankes, Sankin and Garfield were interested in an apartment project in the District of Columbia known as the Livingston Apartments. That enterprise being successful, Sankin and Garfield entered into a partnership in 1956 for the purpose of purchasing a suitable site in the District of Columbia and constructing thereon another apartment building. That partnership was known as Garfield and Sankin. Sankin ascertained that property situated at 5410 Connecticut Avenue, N. W. could be purchased and in April 1956 that property was acquired in the name of Sankin and Garfield individually. The greater part of the funds necessary to effectuate the purchase was advanced by Garfield.

In August 1957 Garfield and Sankin entered into a written agreement for the purpose of defining their respective partnership rights and obligations in the property they proposed to develop. That agreement provided that while Garfield was to have a ⅔ interest with respect to the profits and losses and Sankin a ⅓ interest, the latter was to have an equal voice with Garfield in all decisions affecting the undertaking and property. Garfield was to advance such funds as might be required in excess of the mortgage financing for the construction of the proposed building. It was estimated that those advances would approximate $150,000.00. Garfield was to be paid 6% per annum on the money advanced with a minimum of $17,500.00. Sankin was obligated to plan the building, apply for a F.H.A. commitment, attempt to secure satisfactory mortgage money and to build the apartment building. For his contribution to the undertaking Sankin's services were to be valued at the rate of $300.00 per week from the date the land was acquired in April 1956 until the building was completed and, if the total of that sum together with the total of fees to be paid to building consultants did not exceed $45,000.00, Sankin was to receive an additional equity of $2,500.00.

In the latter part of 1957 an F.H.A. commitment was obtained but Sankin and Garfield concluded it was not feasible to construct the apartment building due to the unfavorable financing terms then available. The parties thereafter agreed to sell the property, together with an assignment of the F.H.A. commitment, building permits, and architectural and engineering plans. On that sale they received a $50,000.00 deposit, which in this case has been referred to as the "Woodner deposit." The purchaser thereafter breached the contract and Garfield and Sankin individually declared the deposit forfeited. The purchaser brought an action to recover the deposit but without success.

In the spring of 1958 Sankin and Garfield decided to proceed with the construction of the apartment building. For that purpose in April 1958 two corporations were incorporated under the laws of the District of Columbia. Garfield and Sankin, Inc. was the corporation created for the purpose of owning and operating the apartment property. Julius Sankin, Inc. was incorporated for the purpose of constructing the building. In the case of each corporation 100 shares of stock were issued, of which Garfield owned 66⅔ shares and Sankin 33⅓ shares. On May 1, 1958 Garfield and Sankin entered into a written stockholders' agreement with respect to each corporation. By the terms of those agreements Garfield and Sankin had an equal voice in the affairs of each corporation notwithstanding Garfield's ownership of 66⅔ shares compared to Sankin's 33⅓ shares. Moreover, Garfield and Sankin each agreed that he, his heirs and assigns would not dispose of any of his shares without first offering the same to the other. Although not incorporated in their written May 1, 1958 agreements, Garfield and Sankin contemporaneously orally agreed that, in the

event either party wished to dispose of his stock, the other party in exercising his right of first purchase was to pay the seller either the reasonable value of the stock at the time of purchase or an amount equal to that offered the seller by a bona fide purchaser for value.

The stock certificates issued by each corporation to Sankin and Garfield set forth no restrictions as to voting rights nor notice of the right of first purchase by a stockholder. Counsel for the corporations advised Garfield and Sankin of the desirability to include such information on the stock certificates. However, Garfield requested that no such legend be placed on the certificates as he did not want his wife to be informed of the facts. Sankin consented.

Following the creation of the two corporations F.H.A. financing was obtained and the construction of the apartment building to be known as the Garfield Apartments was begun. Sankin was in charge of the work while Garfield, whose home was in Florida, intermittently came to Washington in connection with the project. Commencing with May 1, 1958, Sankin, with the consent of Garfield, began to draw the $300.00 a week compensation agreed to in their August 1957 agreement. Under that agreement $32,-000.00 had accrued to Sankin from April 1956 (purchase of property) to May 1, 1958. Also there was $7,500.00 on the books of Garfield and Sankin, Inc. which Sankin had advanced at the time of the purchase of the property—the amount remaining after a $5,000.00 withdrawal by Sankin from the $12,500.00 originally advanced by him.

Prior to May 1, 1958, Garfield had advanced to the Garfield-Sankin partnership $164,500.00 for the purchase of the land on which to construct the building and to defray costs of development. On May 29, 1958 Garfield advanced $25,000.-00 to Garfield and Sankin, Inc. for the apartment building purposes.

By late February or early March 1959 Garfield had become dissatisfied with his relations with Sankin. It was then for the first time that Garfield disclosed to his wife Janet that, while he owned 66⅔ percent of the shares of Garfield and Sankin, Inc. and of Julius Sankin, Inc., he had agreed that Sankin should have an equal voice in the affairs of the corporations. The Garfields determined that Sankin's voting power should be limited to his one-third interest in each corporation, but they did not make known their intention to Sankin. Instead, Janet suggested to her husband that he confer with defendant James Benn in Miami, Florida. She described Benn as a person professing to understand legal technicalities and as an international business man. Garfield knew Benn having had prior unpleasant and unprofitable business dealings with him. But not known to Garfield was the fact that his wife Janet and Benn were at that very time involved in an affair and that they intended to divorce their respective spouses and marry once Benn had settled his income tax difficulties with the United States Government. Moreover, Garfield did not know that Benn had on several occasions asked Janet to obtain for him an interest in the Garfield apartment project.

On March 14, 1959 the Garfields met in Miami with Benn at the office of intervenor-defendant Joseph Pardo, Benn's attorney. During a two hour conference the Garfields explained to Benn the problem of the voting rights and showed him the May 1, 1958 agreements of Sankin and Garfield with respect to their stock interests in both Garfield and Sankin, Inc. and Julius Sankin, Inc. The Garfields also showed Benn all the other documents relating to the apartment project except Garfield's cancelled checks evidencing his advances to the corporations. Benn advised Garfield that he would investigate the situation and devise a plan for restoring to Garfield his full voting rights.

On April 4, 1959 Benn again met with the Garfields and told them that he had investigated Sankin and that Garfield's suspicions were well founded—that Sankin was a fraud and was robbing Gar-

field. He further stated that he, Benn, had devised a legal method of insuring Garfield his full voting rights. Benn further stated that he was advising and assisting Garfield to make up for the loss sustained by Garfield in their prior business transactions and that he would accept no pay for his services except possibly $500.00 with which he would buy a Government bond for the Garfields' daughter, Linda.

The plan conceived and urged upon the Garfields by Benn provided for the sale of Garfield's stock in Garfield and Sankin, Inc. to a corporation which Benn stated would be wholly owned by Garfield. This sale, Benn advised the Garfields, would permit the corporation as a bona fide purchaser to hold free from all of the restrictions of the stockholders' agreement Garfield's 66⅔ shares of stock in Garfield and Sankin, Inc. So that Garfield would not appear as the owner, the stock of the corporation to be formed was to be issued to Benn but immediately endorsed and delivered by him to Garfield. The sales price of Garfield's stock to be sold to the corporation would be set at a price too high for Sankin to meet under his right of first purchase provided in the Garfield and Sankin, Inc. stockholders' agreement. When Garfield set the value of his 66⅔ shares of Garfield and Sankin, Inc. stock as between $375,000.00 and $400,000.00, Benn stated that the sales price of the stock to the to be formed corporation would be $600,000.00, this being a price which Benn believed would be too high for Sankin to meet.

On April 5, 1959, Benn again met with the Garfields and proceeded to draw up in longhand a draft of a stock purchase agreement frequently consulting and showing the Garfields sections of the negotiable instruments law and the District of Columbia corporation law.

On April 6, 1959 Benn met the Garfields at the office of a public stenographer on the mezzanine floor of the Columbus Hotel in Miami, Florida, and proceeded to dictate directly to a typist from the longhand draft the stock purchase agreement. That method, Benn declared, would avoid any record of shorthand notes. When the stock purchase agreement had been completed, he urged and obtained Garfield's execution thereof. Benn executed the stock purchase agreement for a corporation to be formed. The stock purchase agreement, while entered into on April 6, was dated March 14, 1959. It provided, among other things, for the sale by Garfield of his 66⅔ shares of Garfield and Sankin, Inc. stock to the to be formed corporation for $600,000.00 represented by two nonnegotiable, non-interest bearing notes of such corporation, one a demand note of $60,000.00 and one a note of $540,000.00 due December 1, 1959.

Benn and the Garfields next met on April 7, 1959, in the District of Columbia at the office of Benn's Washington attorney. There an escrow agreement was prepared naming The Riggs National Bank of Washington, D. C. as escrow agent. It was executed by Garfield and 5410 Connecticut Avenue Corporation (5410), the to be formed corporation referred to in the stock purchase agreement. Benn signed on behalf of 5410 as "President Pro-tem."

Garfield and Benn on April 8, 1959 delivered to The Riggs National Bank the escrow agreement, the two April 8, 1959 nonnegotiable, non-interest bearing notes of 5410 executed by Benn as president pro-tem, and Garfield's stock power to 66⅔ shares of Garfield and Sankin, Inc. stock. Subsequently Garfield delivered the actual stock certificate.

5410 was formed on April 10, 1959 as a District of Columbia corporation with authorization to issue 100 shares of capital stock.

Benn ascertained for the first time on April 19, 1959 that Garfield was co-signing checks on the bank account of Julius Sankin, Inc. and that there was approximately $80,000.00 in this bank account. Despite the fact that Garfield told Benn that Julius Sankin, Inc. was the construction corporation and had no

permanent value, Benn advised that in furtherance of the plan to defeat Sankin of his 50% voting rights, Garfield should sell his 66⅔ shares of stock in Julius Sankin, Inc. to 5410 at an inflated price of $200,000.00. That price Benn stated would be higher than Sankin could meet.

On April 20, 1959, a stock purchase agreement providing for the sale of 66⅔ shares of Julius Sankin, Inc. stock from Garfield to 5410 and an escrow agreement between The Riggs National Bank, Garfield and Benn as president pro tem of 5410 were drafted. Also drafted on that date were Garfield's stock power to 66⅔ shares of Julius Sankin, Inc. stock and a non-negotiable, non-interest bearing demand note of 5410 in the amount of $200,000.00 payable to Garfield. At Benn's insistence, Benn and Garfield during the evening of April 20, removed from the corporate office of Garfield and Sankin, Inc. and Julius Sankin, Inc. blank checks of those corporations. Those checks had been signed by Garfield several days before in order to make it possible for Sankin to pay construction bills as they became due.

Also on April 20, 1959 at the office of Benn's Washington attorney, Benn asked Garfield for $1,000.00 in cash stating that the corporation (5410) had to be in business "and as long as you own it you might as well give me the money for the stock now, because we have to start a bank account." Garfield made out a check payable to Benn for $1,000.00 but Benn tore it up and demanded one payable to "cash" so that Garfield's name would not appear to be in any way connected with 5410. Garfield thereupon made out his check to cash and endorsed it at Benn's insistence in order to make it appear as if Garfield had actually received cash in exchange for the check. Garfield in fact never received the cash.

The following day, April 21, 1959, Benn delivered the escrow agreement, Garfield's stock power and the demand note of 5410 in the amount of $200,000.00 to The Riggs National Bank trust department, all of which pertained to Gar-

field's 66⅔ shares of Julius Sankin, Inc. stock. Garfield subsequently delivered his stock certificate for 66⅔ shares of Julius Sankin, Inc. to The Riggs National Bank. Also, on April 21, 1959, Benn opened a bank account for 5410 at The Riggs National Bank with a cash deposit of $1,000.00.

And on April 21 Benn and the Garfields went to the apartment project and met with Sankin. Pursuant to Benn's instructions, Joseph Garfield informed Sankin that he had sold to Benn all of his stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. and that Sankin would have to do business thereafter with Benn. Sankin protested that he had a right of first purchase of Garfield's stock. However, Garfield made little or no response. Throughout this entire period Benn continually instructed Garfield to keep quiet and refrain from talking to anybody and to let him handle Sankin. Benn showed Sankin a copy of the negotiable instrument law and stated that he, Benn, was an innocent purchaser for value and that, therefore, he would refuse to recognize Sankin's claim to a 50% voting right. After leaving Sankin, Benn further reassured Garfield that he was "lucky" to get away from Sankin, whom Benn described as a thief, and that it was just a matter of time until he, Garfield, would have his full voting rights restored to him.

Special meetings of the boards of directors of Garfield and Sankin, Inc. and Julius Sankin, Inc. were held on April 24, 1959. Present were Sankin and Arthur Chaite who was not only a member of both boards, but was assistant secretary and counsel of both corporations. Also attending were Benn and his attorney, B. H. Saunders. At these meetings Garfield's resignation as a member of each board and as an officer of each corporation was presented. Benn was then elected to each board and as president of Garfield and Sankin, Inc. and secretary-treasurer of Julius Sankin, Inc. Resolutions were adopted authorizing Benn, or in his stead, Saunders, to countersign corporate checks with Sankin.

Benn, falsely claiming that he had at that time an irrevocable assignment from Garfield of all the funds the latter had advanced for the apartment project, demanded that from the corporate funds $24,000.00 be distributed to 5410. He threatened that if such distribution was not made he would take action to have Garfield and Sankin, Inc. and Julius Sankin, Inc. placed in receivership. Before acceding to such demands and threats, Sankin required Benn to execute an indemnity agreement and he also demanded payment from the corporate accounts of his accrued salary. Benn agreed to Sankin being paid $20,000.00 providing that $8,000.00 of that amount be entered on the corporate books as a loan to Sankin. Thereafter $44,000.00 of the corporate funds were withdrawn and Benn deposited $24,000.00 in 5410 bank account.

The construction of the apartment building continued with the costs being met as they became due. But Sankin, being dissatisfied with the relationship he had with Benn, offered to purchase from Garfield 16⅔ shares of the stock of each corporation in order that he might have 50% of the stock. Garfield refused to sell less than 66⅔ shares in each corporation and stated that sale would have to be on the same terms on which he had purportedly contracted to sell to Benn. Garfield and Benn both agreed that Sankin could have until May 30 to complete the purchase.

During this same period of time Garfield was demanding of Benn some written evidence of the former's entire ownership of 5410 corporation. On April 27 Benn gave Garfield a "holographic" stock power and assignment for 100 shares of 5410. Benn executed that instrument without restriction. And on April 29 Benn executed on the stock certificate an assignment to Garfield of the 100 shares of common stock registered in Benn's name. However, that assignment carried an endorsement reciting that the shares of 5410 stock represented by the certificate were the same shares of stock represented by the stock

power and assignment in favor of Garfield, "which stock power Joseph A. Garfield shall hold as further collateral security for payment in connection with the Garfield Apartment Building, Washington, D. C."

Benn in so assigning the stock deliberately deceived Garfield because at that time, while assuring Garfield that the latter was the entire and true owner of 5410, he did not disclose that on the previous day, April 28, the charter of 5410 had been amended to increase the authorized common stock from 100 to 250 shares. That amendment to the charter followed an April 22 certification to the Corporation Trust Company by the counsel and secretary of 5410 that no stock subscriptions had been received. As already noted Garfield on April 20 had paid $1,000.00 for all of the authorized common stock.

During this same period Benn was seeking not only to take from Garfield the latter's stock ownership in Garfield and Sankin, Inc. and Julius Sankin, Inc. but also monies which Garfield claimed were owed to him by Garfield and Sankin, Inc. On April 26, 1959 Garfield at Benn's insistence gave Benn all of his cancelled checks evidencing his advances to the Garfield and Sankin partnership as well as to Garfield and Sankin, Inc., which checks Benn stated he would photostat and return.

On April 28, 1959, Benn told Garfield that the latter had to show more consideration to 5410 for its notes totaling $800,000.00; that in order to do so, he had to assign over to 5410 the money owed to Garfield by Garfield and Sankin, Inc.; that if he did not Sankin would attack the "bona fides" of the whole scheme. Benn presented to Garfield and urged him to execute an irrevocable assignment to 5410 of his advances but Garfield at that time refused.

Also on April 28, 1965 Benn advised Garfield that a joint letter of authorization to The Riggs National Bank had to be prepared and executed in order to

prevent Sankin from attacking the "bona fides" of the sham transfer of Garfield's stock to 5410. Benn prepared and Garfield executed such a letter. That letter authorized Riggs Bank to deliver to counsel of Garfield and Sankin, Inc. and Julius Sankin, Inc. the stock certificates then held in escrow by the Bank which represented the stock issued by each corporation to Garfield; and the letter further authorized the Bank to receive and place in escrow stock certificates which would represent shares registered in the stock transfer books of the two corporations in the name of 5410. However, because Sankin objected, Garfield's stock certificates were not cancelled on the books of Garfield and Sankin, Inc. and Julius Sankin, Inc. nor were new certificates issued to 5410.

On May 4, 1959 Benn again told Garfield that he was certain Sankin was going to attack the purported sale of Garfield's stock to 5410 and that to prevent this Garfield had to "show consideration" by assigning to 5410 his money advances to the Garfield and Sankin partnership and Garfield and Sankin, Inc. And in order to give a further "bona fide" appearance to their fraud on Sankin, Benn stated that he would give Garfield a stock power for 2,000 shares of bearer stock of International Timber Company, a Panamanian corporation. For such stock power Garfield was to return to Benn the $800,000.00 in notes executed by 5410 to Garfield. At first Garfield refused to follow Benn's advice stating that the transaction was getting too complicated and that he would not sign any more papers. Janet Garfield, in Benn's presence, told Garfield to pay Benn $5,000.00 for his trouble, to get back all documents from Benn and terminate relations with Benn. But Benn was not to be so prevented in the achievement of his purpose. He again reassured the Garfields that they had nothing to worry about, that the papers he requested were necessary to insure the restoration of Garfield's full voting rights which in turn were necessary to protect Garfield from Sankin. He further assured Gar-

field that since he, Garfield, owned 5410 he had nothing to worry about.

After such assurance had been made by Benn and upon Benn's continued urging, Garfield executed the following documents all prepared by Benn:

(a) An irrevocable assignment to 5410 of all of Garfield's advances to Garfield-Sankin partnership and Garfield and Sankin, Inc.

(b) An exchange agreement substituting 2000 shares of bearer stock of International Timber Company for the $800,000.00 in notes of 5410 to Garfield.

(c) A joint letter to The Riggs National Bank authorizing the delivery of those notes marked "Paid and Cancelled" to Benn's attorney.

(d) A paper writing purportedly acknowledging receipt by Garfield of 2000 shares of the bearer stock of the International Timber Company.

While Garfield executed the receipt he never received the stock certificate for 2000 shares of the bearer stock of International Timber Company. In fact this certificate was seen in Benn's briefcase by Mrs. Garfield on May 8, 1959. Benn gave Garfield a stock power for the 2000 shares of bearer stock. Garfield had never heard of the International Timber Company prior to May 4, 1959, and knew nothing about it.

International Timber Company was formed by Benn in July of 1958 with authorized capital of 2000 shares of no par bearer stock. The sole asset of International Timber Company was an option to purchase for $10,000.00 on or before October 24, 1961, one-half of the stock of the Surinam American Timber Company, which purported to have a right to develop certain timber concessions in South America. Benn had previously sold all of the stock in Surinam American Timber Company to Orion Realty Company for $20,000.00 reserving the option. International Timber Company never had a bank account and no stock of the corporation was ever issued until May 4, 1959.

It was on May 6, 1959 that Garfield learned for the first time (from his uncle, Herman Mankes) that Benn had on April 24 withdrawn $24,000.00 from Garfield and Sankin, Inc. as a payment on account of Garfield's advances. Garfield told his wife, Janet, of that withdrawal and she communicated with Benn who was in Washington and asked him to come to Coral Gables, Florida. At that time she and Benn were still intending to be married, but before that event she wanted Benn to return to her husband all that Benn had taken from him, including the $24,000.00 and Garfield's files and cancelled checks which had been given to Benn and which the latter had never returned although he had on several occasions promised Garfield he would do so.

Benn arrived at the Garfield's Coral Gables home on May 8 and he remained there until May 9. While there he denied receiving the $24,000.00 from Garfield and Sankin, Inc. During this period of time there was much acrimonious discussion and among other things Garfield learned for the first time of the relationship between Benn and Janet Garfield. While Benn was at the Garfield home, Janet Garfield took his large briefcase to her brother's home. She noted, but did not take, a certificate for 2000 shares of bearer stock of International Timber Company. There were also in the briefcase two Manila sealed envelopes the corner of one which she tore and noted that it contained currency. On May 9 she returned to Benn the two sealed envelopes as well as the briefcase and all of its contents except the material which belonged to Garfield. Benn gave her a receipt for the money returned which he claimed amounted to $120,-000.00. On the same day and before the return to him of his property, Benn gave Garfield another certificate for 100 shares of 5410 stock.

Garfield on May 11, 1959 for the first time consulted his Miami attorney, Don Nicholson, and told him of the dealings he had been having with Benn. Nicholson immediately advised Garfield that he had wronged Sankin and that Sankin had to be restored to his full voting rights under the May 1, 1958, stockholders' agreements. This was to be accomplished by a complete rescission of the Benn-5410-Garfield transactions leaving Garfield's stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. in Garfield's name and subject to the May 1, 1958, stockholders' agreements. As an alternative procedure Nicholson advised Garfield to gain full control of 5410 and then reverse all of the Benn-5410-Garfield transactions.

Following his conference with Nicholson, Garfield met Benn on May 11 and on May 12. On each of those occasions Benn gave Garfield one or more additional certificates for 100 shares of 5410 stock. And he gave one or more certificates for 100 shares to Janet Garfield. All of the certificates were restricted, purporting to be collateral for 5410's notes of $800,000.00, although, as mentioned above, those notes on May 4 were purportedly exchanged by Garfield for 2000 shares of bearer stock of International Timber Company.

On May 13, 1959, after Benn had returned to Washington, D. C. he issued 250 shares of 5410 stock to himself with Saunders as secretary of the corporation signing the certificate. The 250 shares were issued pursuant to the April 28 amendment of 5410's charter as mentioned above. It was also on May 13 that Garfield attempted to reach Benn by telephone at Saunders' office and upon being told that Benn was not there Garfield talked to Saunders. Garfield told Saunders to instruct Benn not to do anything further with 5410. Notwithstanding such instruction Benn withdrew in cash $17,500.00 from 5410's bank account.

Arthur Phelan, Garfield's Washington counsel, on May 14, delivered by hand a letter to Saunders as secretary of 5410 and at the same time tendered a stock certificate and a stock power, both of which had been previously executed by Benn and each of which assigned to Garfield 100 shares of 5410 stock. Phelan requested that the 100 shares be transferred on 5410's books to Garfield.

By telephone the same day Phelan advised Saunders that it was Garfield's position that Benn was "over-reaching." In response to a question by Phelan, Saunders stated that no stock in 5410 had been issued, despite the fact that as secretary of 5410 he had signed on the previous day Benn's certificates for 250 shares. And it was on May 14 that Saunders resigned as secretary of 5410 but he did not inform Phelan of that fact.

The following day, May 15, Saunders informed Phelan that Benn was willing to have 100 shares of 5410 transferred to Garfield's name. When asked if this was the entire capital stock of 5410, Saunders stated that he was not certain but would investigate and advise Phelan. Saunders subsequently telephoned Phelan and advised him that there were 250 shares of 5410 authorized and he renewed his offer to transfer 100 shares to Garfield. Phelan inquired as to what possible reason there would be for Garfield, who had put up all the money, ending up with only 40% of 5410 while Benn would continue to hold 60%. Saunders gave no explanation.

On May 16, 17, 18, 19 and 21, 1959, Benn was in Saunder's office. Between May 15 and May 21, Phelan called Saunders requesting a meeting of Benn and Garfield to be held on May 21. Saunders informed him that Benn was out of town. On May 21, 1959, Phelan asked Saunders to arrange a meeting of Benn and Garfield but Saunders again stated that Benn was out of town.

Late in the evening of May 21, Garfield in Miami and Benn in Washington talked by telephone. Garfield initiated the call and he demanded of Benn that the latter "return everything to its original state."

Saunders as Benn's counsel on May 22 called Phelan and inquired about a rescission agreement between Benn and Garfield. Phelan having no knowledge of any rescission discussion referred Saunders to Nicholson. Saunders then called Nicholson in Miami and advised him that Benn and Garfield had agreed to a rescission of all of the Benn-5410-Garfield transactions with Benn being paid his out-of-pocket expenses. Nicholson stated that he would prepare a draft of a rescission agreement and forward it to Saunders at the earliest possible date and that he would meet with Benn, Saunders and Garfield as soon as a meeting could be arranged. Nicholson added that he and Garfield would be available at any time on May 26, 27, 28, and 29. Nicholson thereupon prepared a draft of the rescission agreement.

During the May 22 telephone conversation between Nicholson and Saunders, intervenor-defendant Whiting, as counsel for 5410, was on an extension telephone and participated in the conversation. Nicholson stated in the course of the conversation that Benn was perpetrating an enormous fraud on Garfield and that he, Nicholson, did not trust Benn and he didn't think there was any semblance of good faith in the Benn-5410-Garfield transaction.

When on May 25 Saunders received Nicholson's draft of the rescission agreement he discussed it with Whiting. Whiting thereupon called Nicholson who proposed an immediate execution of the rescission documents at a meeting of the parties. Whiting countered with a demand that Garfield first execute the rescission agreement or write a letter stating that all recitations in the rescission agreement were true. Nicholson told Whiting that he did not trust Benn; that he considered Benn a fraud artist; and that he would only deal with Benn at a meeting where all parties executed the rescission agreement contemporaneously.

During the period that Nicholson and Garfield were attempting to effect a complete rescission of the Benn-5410-Garfield transactions, Benn on May 15, 1959, met with Sankin. Benn again asserted that Garfield had sold his stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. and that if Sankin was to acquire that stock under his first purchase rights he would have to purchase it from Benn. At that time Benn told Sankin he knew that the $800,000.00 he

had paid Garfield was greatly in excess of its true value but that he could afford to do so because he was using tax free money from out of the country. Benn offered the Garfield stock to Sankin for $480,000.00. Sankin refused to purchase the stock from Benn and he added that even that sum was in excess of the true value of the stock. Benn then offered to purchase for $250,000.00 Sankin's ⅓ interest in Garfield and Sankin, Inc. and Julius Sankin, Inc. Sankin accepted the offer and Benn stated that his counsel Whiting with Sankin's counsel would prepare the necessary agreement to accomplish the purchase by Benn.

During the following several days Sankin called Whiting on more than one occasion and inquired as to the status of the purchase by Benn. Whiting each time advised Sankin that Benn was out of Washington and could not be reached, although in fact Benn was in Washington. Sankin concluded that Benn was not going to honor his offer to purchase Sankin's stock interests and, realizing that he had to exercise his right of first purchase from Garfield on or before May 30 he arranged to meet with the latter in Washington on May 26.

Sankin with his counsel met with Garfield and Nicholson on May 26 at which time he exercised his right of first purchase by entering into the necessary agreements and delivering his notes totaling $800,000.00 to Garfield. The notes in amounts and terms were as Garfield demanded and conformed to the amounts and terms purportedly agreed to by Benn-5410. Thereafter, late in the same day Riggs National Bank, as escrow agent, was notified of Sankin's purchase of Garfield's 66⅔ shares of stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. On May 27, Riggs National Bank refused to turn the stock over to Sankin because of an adverse claim made by 5410.

Sankin met again with Garfield on May 28 and learned for the first time of the fraudulent transactions between Benn-5410-Garfield for the purpose of depriving Sankin of his equal voice in the affairs of Garfield and Sankin, Inc. and Julius Sankin, Inc. At that time Garfield related all of the facts to Sankin. On May 29 Sankin instituted Civil Action 1493–59.[2]

Although unknown to Sankin at the time, there was on the very day he exercised his rights of first purchase, a meeting being held in the Army and Navy Club in Washington, D. C. The meeting commenced at 10:30 A.M. on May 26 and there were present Benn and intervenor-defendants Link, Pardo, Whiting and Betoff. There and then Benn purported to sell to those four intervenor-defendants 200 shares of 5410 stock. After a discussion lasting about two hours, the price, terms and conditions were agreed upon and the balance of the day was spent with Benn preparing the stock purchase agreement and related papers.

The fifth intervenor-defendant, Winn, arrived in Washington on May 27, 1959 and on that date he purportedly purchased the remaining 50 shares of 5410.

Among the agreements signed by Benn and the five intervenor-defendants was one which gave the intervenor-defendants the right to resell the stock of 5410 to Benn at a substantial profit on December 1, 1959, and which also indemnified them from any loss resulting from their purported purchase. This agreement was subsequently destroyed by the intervenor-defendants after this action was filed.

Intervenor-defendant Link is now deceased.[3] Prior to his death he was the head of the A. M. Kidder Company's stock brokerage office in Miami, Florida. He had been involved with Benn in other transactions and in October of 1958 he represented one Dr. Klawans, a Cuban national, who in turn represented the Orion Realty Company, a Cuban syndi-

---

2. Consolidated Civil Action 4002–60 was instituted by Benn against Janet Garfield on December 6, 1960.

3. Link's executrix was substituted for him in Civil Action 1493–59.

cate. The Orion Realty Company purchased from Benn 2000 shares (all of the issued and outstanding stock) of Surinam American Timber Company for $20,000.00. The closing of that transaction took place in Link's office. The sales contract between Benn and Orion Realty Company reserved a three year option in Benn to repurchase one-half of the Surinam American Timber Company stock for the sum of $10,000.00. That option was immediately assigned by Benn to International Timber Company, an unfunded corporation wholly owned by him. Link was an officer of the International Timber Company; he knew of the assignment of the option; and in all probability executed it. Link did not know at the time of the taking of his deposition, on March 23, 1960, whether Benn had ever exercised his option to repurchase one-half of the stock of the Surinam American Timber Company.

Intervenor-defendant Pardo, at Link's request, was present at the closing of the sale of the Surinam American Timber Company stock to Orion Realty Company. He acted as interpreter for Dr. Klawans and he knew about the assignment of the reserved option by Benn to International Timber Company. Pardo was an officer of the International Timber Company but he later resigned because of a possible conflict in interest.

In May of 1959, Link knew that Benn had no office or home address and he knew that Benn was under a $443,000.00 Internal Revenue Service jeopardy assessment. Benn had also told Link about his difficulties with Garfield and the purported theft of Benn's briefcase and $60,000.00. Link had prepared an affidavit for Benn with regard to the counting by Link of $60,000.00 in $100.00 bills at the latter's home.

A week or ten days prior to May 26, Benn called Link and told him that he had a "good deal" on which Link could make money. He requested Link to be prepared to come to Washington on short notice to consummate the deal. In this first conversation Benn gave no details with regard to what was involved and

Link did not know that an apartment building would be the subject of the "good deal." Link received a second call from Benn on May 22 or May 23 and he was asked to come to Washington immediately Again no details of the proposed deal were disclosed. Link came to Washington on the evening of May 25 and he went to the Army and Navy Club where he met Benn. If any business was discussed that night the discussion was very limited.

At the meeting held in Link's room at 10:30 A.M. on the morning of May 26, Benn offered to sell all of the stock of 5410 for the sum of $550,000.00. Link made no investigation relative to the proposed stock purchase; he did not look at the 5410 minute book, nor did he even look at the apartment property until some time in 1960. Link did not talk to Sankin, did not see any of the records or financial statements of Garfield and Sankin, Inc. and made no investigation of any of the documents which were shown to him. Link knew that Sankin had a right to purchase the stock of Garfield and Sankin, Inc. and Julius Sankin, Inc. for $800,000.00 such right to expire within a few days. Link executed the stock purchase agreement late in the afternoon of May 26 and gave Benn a check for $30,000.00 and an unsecured note for $80,000.00. For that he was to receive 50 shares of 5410's 250 shares. Link believed that his check would be held in escrow and he recalled the discussion relative to the repurchase of 5410 stock by Benn in December of 1959 at a higher price than the intervenors had paid for it. There was also discussion relative to placing the purchase money notes in escrow so as to keep them out of circulation.

Link told Benn not to cash his check as it would not clear but to hold it until he could send him another check. Link, after returning to Miami on the evening of May 26, sent to Benn in care of Saunders' office a check dated June 1, 1959. When Link left Washington he did not have an executed copy of the stock purchase agreement nor did he have any stock of

the 5410 Connecticut Avenue Corporation. He had left a check for $30,000.00, a note for $80,000.00 and thereafter sent a second check for $30,000.00.

Intervenor-defendant Pardo is a Miami attorney who had known Benn since 1950 or 1951. Benn had referred to Pardo as his attorney and the latter had represented Benn's corporations and he had in fact been an officer of International Timber Company, which Benn purported to own. Benn frequently used Pardo's office and Pardo frequently notarized papers for him and acted as interpreter in Benn's various dealings with Spanish speaking people.

Pardo, at Benn's request, left Miami at about midnight on May 25, 1959 to fly to the District of Columbia. He met Garfield and the latter's counsel, Nicholson, at the Miami airport. Nicholson informed Pardo that Garfield and Benn had become involved in a dispute involving an apartment building in Washington, which was named Garfield Apartments and that Nicholson was on his way to Washington to conclude a rescission or cancellation of all of the transactions between Garfield and Benn. In response to Nicholson's question, Pardo stated that he was not aware of any Benn-Garfield transactions and that he, Pardo, was not going to Washington to meet with Benn but that he was on his way to transact other business elsewhere.

Pardo arrived in Washington, D. C. early on May 26 and he went to the meeting in Link's room at the Army and Navy Club where Benn led the discussion of the proposed purchase by the intervenor-defendants of Benn's stock in 5410. The purchase price was discussed first and then documents were shown to the intervenors. This discussion lasted for approximately two hours during which time Benn told the intervenor-defendants about the difficulties he was having with the Garfields over the purported theft of his briefcase and $60,000.00. At lunch time the intervenor-defendants present agreed to purchase Benn's stock and the balance of the day was spent with Benn drafting in longhand and having reduced to type at Saunders' office the stock purchase agreement. At this time Pardo saw the stockholders' agreements executed by Garfield and Sankin on May 1, 1958. Pardo, having seen the exchange agreement and the cancelled 5410 notes to Garfield was aware of the fact that Benn had purportedly exchanged with Garfield 2000 shares of International Timber Company bearer stock for $800,000.00 in notes. Further Pardo was fully aware that International Timber Company had little or no value owning only an option to purchase one-half of the stock of Surinam American Timber Company at a price of $10,000.00. Surinam American Timber Company in turn owned at most a timber concession. In March 1958 Benn had purchased for $15,000.00 the entire capital stock of the purported concessionnaire corporation and in October 1958 had sold the entire capital stock of that corporation for $20,000.00 together with a three year option to repurchase one-half of that stock for $10,000.00, which option was given to International Timber Company.

In the late evening of May 26, 1959, The Riggs National Bank notified 5410 that Sankin had exercised his right of first purchase with Garfield. Pardo then prepared in Saunders' office and sent in the name of 5410 a telegram to The Riggs National Bank which instructed the Bank not to release the stock of Garfield and Sankin, Inc. and Julius Sankin, Inc. to Sankin unless and until the Bank received $800,000.00. This telegram was received by the Bank early in the morning of May 27. The Bank in turn delivered to 5410 at Saunders' office a formal written notification that Sankin had exercised his right of first purchase with Garfield. Thereafter at 10:05 A.M., The Riggs National Bank received a letter prepared in Saunders' office by Pardo which was signed by Benn as president of 5410. That letter was delivered by hand by Whiting and it confirmed the telegram sent the night before. Pardo had full knowledge of Sankin's exercise of his right of first purchase from Garfield not

later than the morning of May 27. Later that morning Pardo executed a stock purchase agreement with Benn and gave Benn his unsecured note for $95,000.00 and his personal check for $15,000.00 for which Pardo was to receive 50 shares of 5410 stock.

Intervenor-defendant Whiting's testimony at the trial was by deposition. He was unable to appear in person since he was incarcerated in the Federal House of Correction in Danbury, Connecticut, after having been found guilty by the United States District Court for the Southern District of New York of attempting to obtain by fraud $20,000,000.00.

Whiting had purchased from Benn in February of 1959 one-half of the stock of Surinam American Timber Company (pursuant to the option to purchase held by International Timber Company) for $10,000.00 in cash and $40,000.00 in notes. This transaction was rescinded at Whiting's request several days thereafter.

On May 15, 1959 Whiting was in the District of Columbia acting as Benn's attorney. By a check dated May 13 Benn had withdrawn $17,500.00 from 5410's bank account. It was in that account he had deposited on April 27 the $24,000.-00 which he had obtained by coercion from Garfield and Sankin, Inc. On May 18, 1959 Benn paid Whiting $18,000.00 in $100.00 bills for the express purpose of permitting Whiting to purchase 50 shares of 5410 stock from Benn. Whiting on May 26 paid Benn $20,000.00 in $100.00 bills as partial payment for the former's purported purchase of 50 shares of 5410.

Whiting was aware of the dispute between Garfield and Benn over the briefcase episode. He had been put on notice by Nicholson that Benn-5410 were perpetrating fraud on Garfield and that there was no semblance of good faith in the Benn-5410-Garfield transactions. Whiting was fully aware of the drafted rescission agreement between Benn-5410 and Garfield and the recitations contained therein.

On May 26, 1959 Whiting had full knowledge of the fact that Sankin had exercised his right of first purchase with Garfield. He participated in the preparation of the telegram to The Riggs National Bank sent late in the evening of May 26. He also helped prepare the confirming letter on May 27 which he hand-delivered to The Riggs National Bank.

Whiting, as counsel for Benn, negotiated with Sankin and Dobin, his counsel, for the sale of Sankin's stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. to Benn. During this same period Whiting was obstructing Nicholson and Garfield in their attempts to have a formal rescission agreement executed by Benn and Garfield.

Intervenor-defendant Betoff is a diamond broker, part owner of the Million Dollar Pier at Atlantic City and half-owner of a diamond exchange corporation. He claimed familiarity with F.H.A. financing and property values.

Benn, whom Betoff testified he knew only casually, first called him on May 24 or 25 and told him that he had a "good deal" from which Betoff could make $10,000.00 to $15,000.00 per year. Betoff came to Washington on the evening of May 25. On the morning of May 26 he went to the Garfield Apartments and walked around the building for a few minutes and at 10:30 went to the meeting in Link's room at the Army and Navy Club. He did not investigate Garfield and Sankin, Inc. or Julius Sankin, Inc. records, he did not read the 5410 minute book and he did not talk to Sankin. He was shown some papers but cannot identify which ones except the cancelled notes in the amount of $800,000.00. He does not know whether he saw the originals or photostatic copies of said notes; in fact, he claims not to know the difference between an original and a photostatic copy. He saw the Goldwyn and Berlin Auditors' report with respect to Garfield and Sankin, Inc. He testified that he thought the Garfield advances to Garfield and Sankin, Inc. as shown on said report were an asset of

Garfield and Sankin, Inc. He also testified that he believed that 5410 held the title to the Garfield Apartments.

On May 27, after notice had been given that Sankin had exercised his right of first purchase, Betoff executed the stock purchase agreement with Benn. He gave Benn his unsecured note for $85,000.00 to be paid out of corporate earnings; it was not to be negotiated by Benn. He also gave to Benn two checks, one for $10,000.00 and one for $15,000.00, the latter not to be cashed for several weeks. Betoff was to receive 50 shares of 5410's stock.

On the subject of Sankin's right of first purchase the testimony of Betoff is confused to say the least. He testified alternatively (a) that Sankin had a right to purchase within a few days for $800,000.00 cash and that 5410 had a right to receive from Garfield and Sankin, Inc. $182,000.00 representing Garfield's advances and (b) that the $800,000.00 purchase price included the $182,000.00 Garfield advances and that Sankin could purchase both the stock and the advances for two-thirds of $800,000.00.

Betoff has been a financially successful man who could be expected to adequately investigate any proposed business venture. But he testified that he made no investigation concerning his investment of $110,000.00 for a purported interest in 5410 although the means were readily available to him. His testimony is that "he wasn't going to look a gift horse in the mouth" and that he did not inquire of Benn as to the latter's reason for selling for $550,000.00 to the five intervenor-defendants that for which Benn had purportedly paid $800,000.00 a little over one month earlier.

On May 27, 1959, Stanley R. Winn arrived in Washington and purportedly purchased Benn's last remaining 50 shares of 5410 stock. Intervenor-defendant Winn is a financial consultant specializing in commercial banking, commercial financing and investment banking. His business requires him to investigate various business ventures and to advise his clients as to the desirability of investing therein. He came to Washington on May 27 on short notice at Whiting's request. He thereupon met with Benn and Whiting who was acting as his (Winn's) attorney. After looking at the documentation for a short period of time, he executed the stock purchase agreement and gave Benn his unsecured note in the amount of $90,000.00 and his personal check in the amount of $20,000.00. After giving his check to Benn an agreement was reached whereby Winn could substitute $20,000.00 in Government bonds for his check. This substitution was made on June 1, 1959.

Despite the fact that all of Winn's negotiations for the purchase of Benn's stock took place at Saunders' office, he claims never to have seen the telegram and confirming letter sent to The Riggs National Bank by 5410 nor the letter from The Riggs National Bank to 5410 all pertaining to Sankin's exercise of his right of first purchase. Of all of the documents which Winn claims to have seen he can only recall seeing photostats of 5410's cancelled notes to Garfield. He admits knowing that Sankin claimed a fifty percent voting right in Garfield and Sankin, Inc. and Julius Sankin, Inc.

With regard to Sankin's right of first purchase Winn testified that he knew that Sankin had such a right but thought it had been extended for several months. He stated that he made no investigation of such extension and saw no documents to support it. He testified that he thought Sankin could purchase for $550,000.00 the 66⅔ shares of Garfield and Sankin, Inc. and Julius Sankin, Inc. as well as the Garfield money loans. He further testified that he understood from Benn or Whiting that Sankin was not going to exercise his right to purchase but he did not talk to Sankin or in any other way attempt to verify that information. Even on June 1 when he substituted Government bonds for his check he did not attempt to find out whether Sankin had exercised his right of first purchase.

In Miami on June 2, 1959, Benn cashed the down payment checks of Pardo, Link and Betoff all with the assistance of Pardo's endorsement. Betoff actually gave Benn cash for his down payment check and then deposited that check into his bank account.

As stated above Sankin instituted Civil Action 1493–59 on May 29, 1959, the day after he learned from Garfield of the fraudulent activities of the latter and Benn. The complaint named 5410, Benn, Garfield and five others as defendants. By the time the action came on for trial the five other defendants had been dismissed and by an amendment the five intervenor-defendants had been added as defendants. The complaint, as amended, alleged a conspiracy by all defendants to fraudulently deprive Sankin of his right to purchase Garfield's stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. and it requested the Court to adjudge the binding effect of the Sankin-Garfield May 1, 1958 stockholders' agreements, to declare the purported transfer of Garfield's stock to 5410 as fraudulent and to award that stock to Sankin in accordance with the May 1, 1958 stockholders' agreements on such terms as would be fair and equitable. Sankin also requested the Court to require The Riggs National Bank to deposit the Garfield shares with the Court and to enjoin the defendants from selling, transferring, pledging, disposing of, registering on the corporation books, or taking any other action that would affect those shares. Thereafter, the shares were deposited with the Court and defendants were enjoined.[4]

Following the filing of the complaint, other pleadings were filed by the other parties to the action which included counterclaims, intervenors' claims and cross claims. Extensive pre-trial discovery was undertaken resulting in among other things voluminous depositions. In October 1963 trial of the consolidated actions was begun with a mistrial being declared after eight trial days. Thereafter additional pleadings asserting additional claims were filed and additional pre-trial discovery was conducted with additional depositions being taken. On October 19, 1964 the second trial commenced and continued on the liability issues alone up to and including January 5, 1965.[5] There are over 6,000 pages of transcript on the liability issues and almost 200 exhibits were received in evidence.

The different claims of the several parties will be treated separately and thereafter the issue of damages will be dealt with.

**I Plaintiff's Complaint**

The first question presented by Sankin's complaint as amended is whether a fraud was worked upon him for the purpose of depriving him of his right of first purchase of Garfield's stock holdings in Garfield and Sankin, Inc. and Julius Sankin, Inc. I find as a fact that Garfield, Benn and 5410 did conspire to fraudulently deprive Sankin of his stock purchase rights. I do not find that the five intervenor-defendants were members of that conspiracy.

The evidence is clear and convincing that at the suggestion of his wife, Garfield went to Benn with whom the wife was involved in a romantic affair. Garfield's sole purpose was to enlist Benn's aid in depriving Sankin of his equal voting rights with Garfield in Garfield and Sankin, Inc. Present at the first meeting on March 14, 1959, were Garfield, his wife, Janet, and Benn. At no time during that meeting of two hours was

---

4. Sankin's complaint, as amended, also seeks reasonable attorney's fees. At the 1962 pre-trial conference and again at the 1964 pre-trial conference Sankin asserted claims for compensatory and punitive damages. Those demands became a part of the pre-trial orders entered.

5. At the commencement of the second trial the Court ruled, as it did when the first trial commenced, that the liability questions would be separately tried and that thereafter the question of damages would be referred to a Special Master. Such a reference was made and will be hereafter more particularly referred to.

anyone else present. Garfield told Benn of his desire and he showed Benn the Sankin-Garfield May 1, 1958 stockholders' agreements. From those agreements as well as Garfield's disclosures, Benn learned that Sankin had an equal voice in the affairs of Garfield and Sankin, Inc. and Julius Sankin, Inc. and also a right of first purchase of Garfield's stock in the event the latter desired to sell. From that time on Benn took charge.

It was Benn who devised the scheme to defraud Sankin, a scheme which Garfield willingly accepted and in which he willingly participated. That scheme in essence was that a corporation (5410) would be formed and Garfield would sell to it his stock holdings in the Sankin-Garfield corporations. The purported price that 5410 would pay would be $800,-000. Benn would be the record holder of all the stock of 5410. All of this Benn advised Garfield would give the appearance of 5410 being a "bona fide" purchaser for value at a price that Sankin could not or would not meet within the 30 day first purchase period provided by the May 1, 1958 Sankin-Garfield stockholders' agreements. After Sankin failed to exercise his first purchase rights, Benn would assign all of the stock of 5410 to Garfield.

To accomplish the purpose of the scheme devised by Benn many purported legal documents were drawn and signed by Garfield or Benn and in some instances by both between April 6 and May 4, 1959. These included stock purchase agreements, an assignment of money claims, escrow agreements, stock powers, assignments of stock certificates, letters of authorization directed to the escrow agent, the Riggs National Bank, cancellation of the three notes totaling $800,-000 and receipt for 2000 shares of International Timber Corporation stock. Some of these instruments were prepared originally by Benn in his own handwriting and then dictated directly to a typist so that, according to Benn, there would be no shorthand record. All instruments signed by Garfield were done at the urging and direction of Benn so that Sankin could not attack the "bona fides" of the transaction.

After the purported stock purchase agreements had been entered into between Garfield and Benn on behalf of 5410, the $800,000 of notes signed by 5410, escrow agreements entered into, and Garfield's stock powers signed, Garfield, his wife and Benn called on Sankin. Except for advising Sankin that he had sold his stock to Benn and that he had no further interest in the corporations, Garfield had little to say as he had been directed by Benn to let the latter do the talking. Benn had much to say to Sankin, among other things that he as the owner of the former Garfield shares would not recognize Sankin's equal voting rights. Garfield resigned as director of and from his offices in Garfield and Sankin, Inc. and Julius Sankin, Inc. Benn was elected in Garfield's stead, and thereafter asserted ownership through 5410 of Garfield's stock interests. On one occasion after taking over Garfield's position, Benn stated to Sankin that he knew he had "overpaid" Garfield for the stock but he did so because it was an advantageous deal since he was using tax free money from out of the country.

Garfield admitted, in his answer and in open court, to scheming with Benn to defraud Sankin. Janet Garfield testified at length to those facts. Benn denied the fraud and claimed he, through 5410, was a bona fide purchaser for value of Garfield's stocks. According to the evidence in this case those three are the only persons in a position to know whether it was with fraudulent motivation that they planned and acted. I have, therefore, been compelled to pass on the credibility of these three in finding that they did work a fraud on Sankin.

Joseph Garfield has confessed to being a party to the fraud worked on Sankin. Such conduct is not to be condoned with respect to anyone and here the conduct is the more grievous since Sankin was Garfield's relative by marriage and a partner for several years in a successful business venture. Moreover, I am aware

that Garfield has a direct interest in the outcome of this proceeding. I have had the benefit of observing Garfield on the witness stand. I noted his appearance, demeanor, and conduct as a witness. I have given consideration to his manner of testifying; I did not find him evasive nor did I note any tendency on his part to distort his testimony. To me he appeared frank and candid in his testimony.

What I found worthy of belief in Garfield I found totally lacking in Benn. The hallmark of his testimony was evasion flavored with contradiction. Time after time he had to be directed to answer the question and not evade. And when he would be compelled to give an answer, it was usually an exercise in circumlocution. His appearance, manner, demeanor and conduct as a witness was that of a person unworthy of belief. He did not look nor did he act as a witness who was telling the truth fully, frankly and freely what he knew to be so.

In fact his appearance and conduct as a witness was so motivated by his most substantial interest in the outcome of this case that he gave testimony without regard to truth.

Furthermore, most improbable is Benn's testimony that, while Garfield sold his ⅔ interest in the Garfield Apartments, including monies owed to him for $800,000 as evidence by 5410 notes, thereafter, he (Garfield) marked those notes cancelled and paid in consideration of Benn assigning to him 2000 shares—the entire issue—of the capital stock of International Timber Company. Benn's own testimony disclosed that all International Timber Company claimed as assets was an option to purchase ½ of the shares of Surinam-American Timber Company for $10,000.00. Benn testified that in October 1958 he owned all of the stock in Surinam-American which he asserted owned timber concessions in Surinam of great value; that in that month he sold his holdings in that corporation for $20,000.00 with a three year option

to purchase for $10,000.00 ½ of the shares of Surinam-American. That option, according to his testimony, Benn assigned to International Timber Company. Benn's testimony further disclosed that International Timber Company was of so little consequence that it never had a bank account nor had any of its stock ever been issued prior to May 4, 1959, the day Benn claims 5410's notes were cancelled in consideration of his assigning the Timber Company stock to Garfield.

But even if I were in any state of doubt —which I am not—as to whether I should credit Benn's testimony or that of Garfield, I would be compelled to resolve that doubt against Benn in view of the credence I place in Janet Garfield's testimony which is in direct conflict with Benn's.

I do not condone Janet Garfield's affair with Benn. I do not condone her participation in the fraud worked upon Sankin. I am aware that she considers her husband's property to be hers also and for that reason she can be said to have an interest in the outcome of this case. However, I observed her as a witness who testified at great length and was subjected to proper but searching cross examination. I observed that throughout her testimony she was forthright. She did not evade; when she was unable to answer she so testified. To me she looked and acted as a witness telling the truth fully, frankly and freely, which to say the least was a most embarrassing experience for her. I give her testimony full credence.

As further evidence of the fact that Benn cannot be believed is the candid statement of counsel for 5410. On page 8 of 5410's Reply Brief (filed February 8, 1965) it is stated: "It is conceded that this defendant [5410], as purchaser of two-thirds of the stock, *had actual notice, prior to the purchase,* of the existence and the terms of plaintiffs' exhibits 1 and 2." (Emphasis supplied.) The exhibits counsel was referring to are the May 1, 1958 Sankin-Garfield stockhold-

ers' agreements.[6] In contrast to 5410's concession is Benn's testimony that he never saw those agreements until April 23, 1959, which was subsequent to the time 5410 acting through Benn purportedly purchased Garfield's stock interests, and that prior to April 21, 1959, he never knew of Sankin's voting rights in Garfield and Sankin, Inc. and Julius Sankin, Inc. From April 4, 1959, the date Benn conceived 5410, until May 26 and 27, 1959 when he purportedly sold all of 5410's stock to the intervenor-defendants, 5410 was Benn and Benn was 5410. The latter's concession in reply brief must necessarily concede that Benn was aware of the existence and terms of the Sankin-Garfield stockholders' agreements prior to the purported purchase of Garfield's stock by Benn–5410.

■■ Benn's testimony of his good faith purchase for value of Garfield's stockholdings in the apartment enterprise is unworthy of credence. I give it none.[7]

■■ The facts, as found here, establish the essential elements of fraud, viz: (1) A false representation (2) in reference to a material fact (3) made with knowledge of its falsity (4) and with the intent to deceive (5) with action taken in reliance upon the representation. Pence v. United States, 316 U.S. 332, 338, 62 S.Ct. 1080, 86 L.Ed. 1510, rehearing denied, 316 U.S. 712, 62 S.Ct. 1287, 86 L.Ed. 1777 (1942), United States v. Kiefer, 97 U.S.App.D.C. 101, 102, 228 F.2d 448, 449 (1955), cert. denied, 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815, rehearing denied, 350 U.S. 977, 76 S.Ct. 431, 100 L.Ed. 847 (1956). Benn and Garfield falsely represented to Sankin that Benn's creation, 5410, had purchased for $800,000 Garfield's stock in Garfield and Sankin, Inc. and Julius Sankin, Inc. They made that false representation in furtherance of the scheme conceived by Benn and participated in by Garfield for the purpose of inducing Sankin to conclude that he either could not or would not meet the inflated price of $800,000 in order to acquire Garfield's stock interest. Sankin, although considering the price to be excessive, purchased Garfield's stock on the terms represented to him as having been agreed to by 5410 in order to protect his one-third interest and equal voice position in the two corporations.

■ Garfield in acting as he did with and through Benn violated his fiduciary duty to deal fairly, honestly, and openly with his fellow stockholder Sankin. He not only failed to make disclosure of all essential information to Sankin but, instead joined with Benn and deliberately gave false information to Sankin. Helms v. Duckworth, 101 U.S.App.D.C. 390, 394, 395, 249 F.2d 482, 486, 487 (1957).

Without merit is 5410's assertion that no misrepresentation of material fact was made to Sankin because on April 29, 1959, he had seen legible copies of the Benn–5410–Garfield agreements, some of which showed that if 5410 defaulted, the escrowed stock would be returned to Garfield and the escrowed notes to 5410. Those instruments evidence the purported purchase of Garfield's stock for $800,000; that the stock was placed in escrow along with 5410's nonnegotiable notes; that 5410 would receive the stock upon payment of the notes, two of which were payable on demand and the third and

---

6. That counsel for 5410 meant plaintiffs' exhibits 2 and 3 rather than as he stated exhibits 1 and 2 is obvious from a reading of the entire paragraph of the brief in which the quoted sentence appears. The very first sentence of that paragraph reads "Plaintiffs' exhibits 2 and 3" and it is with those two stockholders' agreements that the entire paragraph treats. Also reference to plaintiffs' exhibits "2 and 3" is made on page 14 of 5410 Reply Brief. Reiteration of the concession appears on page 18 of that Brief.

7. During the trial Garfield offered in evidence a certain opinion of the Tax Court of the United States filed in tax litigation involving Benn. Garfield argued that the opinion could be considered with respect to Benn's credibility. I would not admit in evidence that opinion; I have not considered it in concluding Benn's testimony here was unworthy of belief.

largest ($540,000) had a December 1, 1959 due date. There was no reason for Sankin to believe there would be a default; indeed he was only justified in believing there would not be. On April 21, Garfield had told him he had sold to Benn and Benn claimed ownership. And on April 29, when Sankin was given copies of the Benn–5410–Garfield documents, there were present not only Benn and the secretary-counsel of 5410 but also a representative of Riggs Bank with the Garfield stock which Benn insisted be cancelled and new stock issued to 5410. It was also on April 29, at the same meeting, that the secretary-counsel of 5410 advised Sankin that he had until May 30 to exercise his first purchase right.

Moreover, on May 15, prior to Sankin exercising his purchase right on May 26, Benn told Sankin that he was the only one Sankin could deal with. It was at the same meeting that Benn advised Sankin that he was using tax free money from out of the country and for that reason he had been willing to agree to overpay Garfield.

Inconsistent to say the least is 5410's contention that no misrepresentation was made to Sankin because of the April 29 disclosure of the Benn–5410–Garfield documents, when it is on those very same documents that 5410 bases its claim of ownership to Garfield's stock.

Also unsupportable is the contention made here that Sankin has failed to show that he has suffered any damage as a result of the Benn–5410–Garfield fraud. It is argued that Sankin's $800,000 notes to Garfield are nonnegotiable, non-interest bearing and impose no personal liability on Sankin. But that argument disregards the facts (1) that the notes in amount and form are as Garfield required of Sankin and (2) that Garfield's stockholdings which were sold, assigned and transferred to Sankin on May 26, 1959, would, under the terms of the pledge agreement, revert to Garfield if Sankin was unable to pay the notes when due.

By the March 14, 1959 stock purchase agreements between Garfield and Benn–5410, the parties acknowledged Sankins' rights to purchase Garfield's stock but they agreed that for him to make such purchase he would have to do so "upon the same terms and conditions" as were agreed to by Benn–5410. Sankin knew of those agreements when he was furnished legible copies on April 29, 1959. And more than that he was told he would have to meet Benn–5410's terms and conditions when in mid-May, 1959 he tried to purchase 16⅔ shares in each corporation and again on May 26 when he signed the notes for $800,000.00.

Benn–5410, pursuant to the fraudulent stock purchase agreements, made and executed one promissory note in the amount of $200,000.00 and a second promissory note in the amount of $60,000.00. Both of those notes were nonnegotiable, noninterest bearing and payable upon demand. The third note made and executed was in the amount of $540,000.00. It also was nonnegotiable, non-interest bearing but payable on or before December 1, 1959. Sankin's notes were in exactly the same terms.

The notes executed by Benn–5410 were placed in escrow with The Riggs National Bank as were Garfield's stock certificates. The escrow agreements provided that if Benn–5410 defaulted in payment, the stock was to be returned to Garfield and the notes "and any cash payments held by the escrow agent for the account of" Garfield were to be returned to Benn–5410. There was no liability imposed on Benn–5410 for the payment of the notes. And at the time the escrow agreements were entered into there was no assignment and transfer of the stock to Benn–5410.

But unlike Benn–5410, Sankin on May 26, 1959, actually acquired title to Garfield's stock, the same having on that date been sold, assigned and transferred to Sankin by Garfield. To secure the $800,000.00 purchase notes Sankin pledged the stock with Garfield. The pledge agreement provides that should Sankin fail, refuse or default in the payments of the notes, Garfield could mark the notes paid and return them to Sankin

and Garfield would be restored to ownership of the stock. But if Sankin is to retain title to the stock he must pay the notes. By this action and through the relief he seeks, he has evidenced his intent to retain ownership. Thus he is liable for the $800,000.00, a fraudulently inflated price and the damage he has suffered is the difference between that amount and the reasonable value of the Garfield stock.

Garfield asserts that the damage, if any, that Sankin suffered was self inflicted. He argues that Sankin could have rescinded his stock purchase contract with Garfield on May 28, 1959 when Sankin first learned of the fraud; that since Sankin did not he approved the purchase of the stock at the fraudulently inflated price and that he, therefore, cannot complain of the damage he suffered. Garfield cites Simon v. Rossier, D.C. Mun.App., 127 A.2d 394 (1956) as one authority for that position. But the *Simon* case was treating with an executory contract. The purchaser of the house in that case had done nothing but make a deposit of $547.50 at the time he learned of the fraud in the inducement of the contract to purchase. Rossier, the purchaser had been induced to purchase the house on the false representation that it would be built and delivered within sixty days. In fact, construction was not even begun within that time. Rossier being aware of this fact, nevertheless, requested the defendant to build the house as soon as possible. He, therefore, waived any action for fraud.

■ Here, Sankin's purchase of Garfield's stock was an accomplished fact. His position was like that of the purchaser of real estate in Hale v. Helvering, 66 App.D.C. 242, 85 F.2d 819 (1936), to whom title was transferred upon payment of $20,000.00 in cash and $40,000.00 in notes secured by a first mortgage. The Ninth Circuit Court of Appeals in analyzing the facts in *Hale* stated: "It is evident that in that case the original transaction had been *fully* completed, as to all parties. Title to the property had been transferred and *new obligations were created, promissory notes*, secured by mortgage." Wener v. Commissioner of Internal Revenue, 242 F.2d 938, 943 (9th Cir. 1957). (Emphasis as in reported case.)

Garfield has overlooked the fact that what Sankin did on May 26, 1959, was to exercise his rights provided him by the May 1, 1958 agreements—written and oral. He was induced to agree to the $800,000.00 price for the stock as a result of the Garfield–Benn–5410 fraud. In the District of Columbia "[o]ne who has been induced to enter into a contract by false and fraudulent representations may rescind the contract; or he may affirm it, keeping what he has received under it, and maintain an action to recover damages he has sustained by reason of the fraud; * * *." Wyatt v. Madden, 59 App.D.C. 38, 39, 32 F.2d 838, 839 (1929). See also United Securities Corporation v. Franklin, D.C.Mun.App., 180 A.2d 505, 510 (1962).

■ Moreover, this is a case "where the defrauded party may, by reason of the wrong, be unable to recede from his situation without prejudice." Kingman & Co. v. Stoddard, 85 F. 740, 749 (7th Cir. 1898). On May 28, 1959, when Sankin learned for the first time of the Benn–5410–Garfield fraud on him, he knew that unless he was able to retain the stock he had acquired from Garfield on May 26, he would have as his partner in the two close corporations either Garfield or 5410 which to him was Benn. Neither could be a satisfactory partner. Garfield, with whom he had been so closely associated for several years in business and to whom he was related through marriage, had seen fit to have participated in a fraudulent conspiracy to deprive him of his equal voting rights, which were the very rights that Garfield had agreed he should have. Benn he had come to know too well in the month past. Under the threat of placing the two corporations in receivership Benn has compelled Sankin to disburse $24,000.00 of Garfield and Sankin, Inc. funds to Benn. Moreover, constantly since April 21 Benn had been asserting that he would refuse to recog-

nize Sankin's equal voting rights. Under such circumstances, a recision would not afford Sankin an adequate remedy and therefore he was not obliged to rescind even if it were possible for him to do so. Grand Trunk Western R. Co. v. H. W. Nelson Co., 116 F.2d 823, 833 (6th Cir. 1941). See also Horning v. Ferguson, D. C.Mun.App., 52 A.2d 116, 119 (1947).

Some of the defendants contend that Sankin could have suffered no damages because of a May 26, 1959 indemnity agreement between him and Garfield. By that agreement Garfield contracted to indemnify and hold harmless Sankin " * * * from and against all damages, loss, costs and expenses arising or growing out of any claim, demand, action or cause of action asserted against the said Julius Sankin by any person, firm or corporation and resulting from or arising out of any and all transactions between Joseph A. Garfield, on the one hand, and James T. Benn or 5410 Connecticut Ave. Corporation, a District of Columbia corporation, on the other hand, relating to the sale by Joseph A. Garfield and the purchase by 5410 Connecticut Ave. Corporation of capital stock in Garfield & Sankin, Inc. or Julius Sankin, Inc., each District of Columbia corporations (sic), or resulting from or growing out of the purchase by Julius Sankin from Joseph A. Garfield of any of the capital stock of the said Garfield & Sankin, Inc. or of the said Julius Sankin, Inc. * * *."

When Sankin entered into the indemnity agreement of May 26, 1959, he was unaware of the Garfield–Benn–5410 fraud worked upon him. But he did know then and had known from April 21, 1959, that Garfield had advised him that the stock had been sold to Benn and that Garfield had no further interest in the two Garfield apartment corporations. He also knew that Benn had asserted ownership through 5410 of the Garfield stock and that he would have to purchase that stock from Benn–5410. And he also learned from Garfield that he would have to purchase all of Garfield's stock from Garfield. Faced with conflicting claims of Garfield and Benn–5410, Sankin did

the prudent thing when he demanded, at the time he purchased the Garfield stock, that Garfield indemnify him against any claims asserted by Benn–5410 or anyone holding under them. As a result of that agreement Garfield has paid on behalf of Sankin certain attorneys fees and costs resulting from the claims asserted against Sankin in this action by Benn–5410 and the five intervenor defendants. But those compensated costs have no bearing on the damage Sankin has suffered because of the $800,000.00 fraudulently inflated purchase price he was required to meet in order to exercise his first right to purchase Garfield's stock.

Nor can it be said that Sankin's May 26, 1959 general release to Garfield constitutes a waiver of the damages suffered by Sankin. On the day he executed the release, he was unaware of the fraud although Garfield, the party released, was well aware of that fact. But while Garfield kept Sankin uninformed he accepted, if he did not demand, the release at the same time he executed a general release to Sankin.

Also on May 26, 1959, Sankin and Garfield executed three other instruments. Two were voting trust agreements, one pertaining to Garfield and Sankin, Inc. stock and one to Julius Sankin, Inc. stock. The third agreement was a stockholders' agreement relating to the restrictions on disposition of that stock. None of those agreements would become effective unless Sankin defaulted in the payment of the $800,000.00 notes. In the event of such a default those agreements would give each stockholder the right of first purchase of the other's stock and pending such disposition each stockholder would in effect have an equal voice in the affairs of the corporations through the voting trust agreements. All three agreements provided that there would be endorsed on the stock certificates the restrictions provided by the agreements. Sankin on May 1, 1958, agreed to Garfield's request that no endorsements be placed on the stock certificates. By May 26, 1959, he had learned, through Garfield's breach of his fiduciary duties and

the conduct of Benn, that his 1958 willingness to assist his erstwhile partner brought him nothing but trouble. He would not let that happen again. However, the effect of the voting trust agreements and the stock transfer restriction agreement is moot here since Sankin seeks delivery of Garfield's stock which he purchased on May 26, 1959 and compensation for the damages he has suffered because of Garfield–Benn–5410 fraud.

While conceding that Benn–5410 had actual notice before purchase of the Garfield stock of the May 1, 1958 agreements providing equal voting rights as well as the right of first purchase to Sankin, 5410 contends that those limitations and restrictions on Garfield's stock are unenforceable against "a transferee as a matter of public policy prescribed by statute, regardless of actual prior notice by the purchaser." Benn and the intervenor-defendants assert the same proposition, that is that the limitations and restrictions in the May 1, 1958 agreements are unenforceable as being contrary to statute.[8] The statutory provisions those defendants contend apply here are the following:

§ 28–2915, D.C.Code (1961):[9]

There shall be no lien in favor of a corporation upon the shares represented by a certificate issued by such corporation and there shall be no restriction upon the transfer of shares so represented by virtue of any bylaws of such corporation, or otherwise, unless the right of the corporation to such lien or the restriction is stated upon the certificate.

§ 29–239, D.C.Code (1961):

* * * All certificates for stock which has no voting powers or is restricted or limited as to its voting powers, * * * shall have a statement of such restriction, limitation * * * plainly stated thereon.

§ 29–908, D.C.Code (1961):

(a) Each corporation shall have power to create and issue the number of shares stated in its articles of incorporation. Such shares may be divided into one or more classes, any or all of which classes may consist of shares with par value or shares without par value, with such designations, preferences, voting powers, special or relative rights and such limitations, restrictions, or qualifications thereof as shall be stated in the articles of incorporation. The articles of incorporation may limit or deny the voting power of the shares of any class.

§ 29–911, D.C.Code (1961):

(a) Unless otherwise provided in the articles of incorporation, each outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders.

Act of June 8, 1954, Ch. 269, § 20, 68 Stat. 189 formerly § 29–908g of D.C.Code:[10]

(b) Every certificate representing shares issued by a corporation which

8. While Benn contends that he and 5410 had no notice of the stock restrictions prior to purchase, he also argues that if they had notice the restriction would be unenforceable as against them as a matter of public policy prescribed by statute.

9. § 28–2915, D.C.Code (1961) was repealed by the Uniform Commercial Code, Act of Dec. 30, 1963, 77 Stat. 631 et seq., Pub.L. 88–243, effective January 1, 1965. However, as provided by section 16 of the Act, that repeal does not affect the applicability here of § 28–2915, if it be otherwise applicable, since the purported stock transfer at issue here ante-

dated the effective date of the repealing Act. This opinion refers to the 1961 D.C.Code, rather than the recently issued 1967 Code because the briefs filed by the parties cite the 1961 Code. However, with the exception of § 28–2915, D.C. Code (1961), all other 1961 citations remain unchanged in the 1967 Code and bear the same Code citations.

10. In their briefs in reply to plaintiff's brief on complaint, 5410 and intervenor-defendants cite § 29–908g, D.C.Code (1961). That provision would in no event be applicable here since it was the result of a July 23, 1959 amendment which did not become effective until 60

is authorized to issue shares the transferability of which is restricted or limited shall state upon the face or back thereof, in full or in the form of a summary, all of the limitations and restrictions upon the transferability thereof.

■ In considering defendants' contentions with respect to the foregoing Code provisions, it should be first noted that § 29–239, D.C.Code (1961) has no application. It is a provision of the Business Corporation Act of 1901, as amended, § 29–201 et seq., D.C.Code (1961). Garfield and Sankin, Inc. and Julius Sankin, Inc. are District of Columbia corporations organized in April, 1958. They could only have been incorporated under the Business Corporation Act of 1954, § 29–901 et seq., D.C.Code (1961), Act of June 8, 1954, 68 Stat. 179. Section 146 of that Act provided that the Business Corporation Act of 1954 would take effect 180 days after June 8, 1954, and that thereafter no corporation eligible to be formed under it could be incorporated under any other Act then in force in the District of Columbia, which included the 1901 Act. Garfield and Sankin, Inc. and Julius Sankin, Inc. were eligible to be formed under the 1954 Act since they were and are corporations for profit and exercise powers as contemplated and conferred by that Act. See §§ 29–903, 29–904, D.C.Code (1961).

An examination of the articles of incorporation of both Julius Sankin, Inc. and Garfield and Sankin, Inc. evidence the fact that they conform to § 29–908 (a), D.C.Code, (1961). The articles of Julius Sankin, Inc. provide for one class of capital stock numbering 100 shares without par value. Those shares are without limitations, restrictions or qualifications; the articles of incorporation neither limit nor deny the voting power of the shares. Since the articles do not

otherwise provide, each of those 100 shares is entitled to one vote on each matter submitted to a vote at a meeting of stockholders as provided by § 29–911, D.C.Code (1961).

The Garfield and Sankin, Inc. articles of incorporation authorize two classes of stock, preferred and common. There are 100 shares of preferred stock with a par value of $1.00 per share. The common stock is divided into 100 shares with each share having a $10.00 par value. Provision is made by the articles of incorporation for voting power in the preferred stock in certain circumstances not material here. At all other times the voting power is in the holders of the common stock. Since the Garfield and Sankin, Inc. articles are silent as to the distribution of that voting power, § 29–911, D.C.Code (1961) gives to each share one vote on each matter submitted to a vote at a meeting of shareholders.

■ And the May 1, 1958 agreements between Sankin and Garfield concerning their common stock holdings in the two corporations does not alter the voting power of each share of such stock. Stated in identical language in those two agreements, Garfield and Sankin agreed that "each shall have an equal vote in the affairs of the corporation", that is that neither "can have a larger or greater vote than the other irrespective of the numerical amount of stock owned" by each. Those agreements do not take from Garfield's shares any voting power as indeed they could not since it is the statutes and the articles of incorporation which give the voting power to the shares. What Garfield did by those agreements was to forego for and on behalf of himself, his heirs and assigns voting one-half of his holdings of 66⅔ shares and thus he made possible an equal voice for Sankin, his heirs and assigns. Such was the arrangement of the pre-

---

days later. Act of July 23, 1959, 73 Stat. 240, Pub.L. 86–106, §§ 3, 18. The provision set forth in the above text was in effect on May 1, 1958 and until 60 days after July 23, 1959. How-

ever, from defendants' arguments it would appear that they would contend that the provisions quoted in the text would be equally applicable.

May 1, 1958 partnership agreement which brought Garfield with his money and Sankin with his money, his know-how and his personal services together for their mutual advantage in the apartment house enterprise.

No District of Columbia authorities have been cited or otherwise have come to my attention respecting the validity of contracts of the nature of the Sankin-Garfield May 1, 1958 agreements. However, it would seem that "ownership of voting stock imposes no legal duty to vote at all" would be a principle that should find general acceptance. That principle was approved by the Supreme Court of Delaware in Ringling Bros.–Barnum & Bailey Combined Shows v. Ringling, 29 Del.Ch. 610, 53 A.2d 441, 447 (1947). In that case two of the three stockholders agreed to vote their stock jointly or unitedly. And while each voted her entire shares her voting power was limited to a joint effort—so much so that if agreement between the two could not be reached on the object of their joint effort a named arbitrator was to decide how the stock should be voted. In holding that agreement valid the court stated that a stockholder had no legal duty to vote any of his shares. Here there are but two stockholders, Garfield and Sankin. They had a common objective to make a profitable venture out of their apartment house enterprise. If Garfield in accomplishing that objective could have decided not to vote any of his stock he surely could agree to vote only half of his shares which is exactly what he did.

In Trefethen v. Amazeen, 93 N.H. 110, 36 A.2d 266 (1944), the Supreme Court of New Hampshire ruled on a stockholders agreement which provided that one stockholder would withhold voting certain of his shares in order that two other stockholders would have a 50% voting power. The one stockholder agreed to limit his voting so that the corporation could secure additional working capital. The court in approving the agreement stated that the "validity of a contract between stockholders is to be determined by the effects of its provisions." Id. at 111, 36 A.2d at 267. There the court pointed out that the contract worked no injury to the corporation, stockholders or creditors from the addition of new funds; that the only detriment was to the parties, namely, the paying out of money by two of them and the loss of voting rights by the third party, all of which detriment had been contracted. As there so here. The Garfield-Sankin agreements worked no injury to the corporation or its creditors. They are the only two stockholders. The detriment suffered was Garfield withholding voting $33\frac{1}{3}$ shares of his stock and Sankin giving his services and know-how to their joint enterprise.

Nickolopoulos v. Sarantis, 102 N.J.Eq. 585, 141 A. 792 (E. & A. 1928) is cited for the proposition that a stockholders' agreement altering the voting power of any share of stock is invalid. There the New Jersey Court of Errors and Appeals refused to enforce an agreement which gave one stockholder, who owned 25 percent of the stock, a 50 percent vote in the affairs of the corporation. In that case four persons, including the plaintiff, owned all the stock. As is apparent from its opinion the court was concerned with what such a "secret agreement" might do in other circumstances such as where " * * * stockholders not parties to the agreement and others dealing with the corporation would be in complete ignorance." Id. at 586, 141 A. at 793.

The New Jersey court was concerned with the effect of the restrictions in a stockholders' agreement on the innocent and unwary. But the defendants and intervenor-defendants were neither innocent nor unwary. They knew of the restrictions in the Sankin-Garfield stockholders' agreements. Garfield entered into the agreements with Sankin. When he became unhappy with them, upon his wife's urging, he went to Benn and revealed to him the terms of the agreements. Benn had brought into being 5410 for the purpose of providing a cover for their fraudulent activities. The in-

tervenor-defendants when they purchased 5410's stock from Benn knew of the Sankin-Garfield stockholders' agreements. Benn–5410 and the intervenor-defendants now ask this Court to condone the fraudulent activity of Benn–5410–Garfield by holding invalid the stockholders' agreement by which Garfield agreed to forego voting one-half of his stock holdings. Sufficient here is the recent utterance of the Court of Appeals for this Circuit: "This record discloses a cleverly conceived and boldly executed fraud to which judicial approval cannot be given." Fontana v. Aetna Casualty & Surety Co., 124 U.S.App.D.C. 168, 171, 363 F.2d 297, 300 (rehearing en banc denied, August 4, 1966).

Notwithstanding the fraud that brings this case to this Court, Benn–5410 and the intervenor-defendants seek to have the Garfield-Sankin stockholder agreements declared invalid for a second reason, that is that the right of first purchase in each stockholder is not noted on the face or back of the stock certificates. In support of their position those defendants cite § 28–2915 and § 29–908g, D.C. Code (1961) as quoted supra. There being no District of Columbia cases construing those Code sections, they cite decisions of other jurisdictions.

An examination of the cited cases discloses that they upheld transfers of stock notwithstanding a restrictive by-law or other agreement where the restriction was not noted on the certificates as provided by statute. And in some instances the purchaser had actual notice of such restrictions at the time he purchased the stock.[11] But in none of those cases was the transfer the result of the fraud of the transferor and transferee.

Plaintiff, on the other hand, has cited cases which treat with the question of whether parties possessing knowledge of a restrictive by-law or agreement may utilize the statutory provisions cited by defendants as a shield to protect themselves from the consequences of their unconscionable action.

In Doss v. Yingling, 95 Ind. App. 494, 172 N.E. 801 (1930), plaintiff brought the action to enjoin a stockholder (Yingling) from transferring corporation stock except in accordance with the terms of a stockholder's agreement and a company by-law. He also sought to enjoin the company treasurer from effectuating such transfer on the corporation's books. The stockholders' agreement, evidenced by a corporation by-law, provided that if a stockholder desired to sell his stock the remaining stockholders were to have the first right to purchase such stock. Plaintiff asserted that defendant Yingling, whose certificate of stock did not recite the by-law restriction, was threatening to transfer and assign for value some of his stock to some "innocent purchaser" who was not a stockholder and "who has no notice of the above-mentioned agreement and by-law * * * in order to defeat [plaintiff's] rights in said corporation." The trial court sustained a demurrer to the amended complaint. That judgment was reversed on appeal. The appellate court, in considering an Indiana statute, substantially identical to § 28–2915, D.C.Code (1961), stated:

"The above act of our Legislature in relation to the transfer of stock was 'designed for the protection of innocent purchasers of stock, in the open market or otherwise, and not at all as a shield by one with knowledge of a condition to unconscionably protect himself from the consequences thereof.'" Id. at 497, 172 N.E. at 804.[12]

---

11. See for example among the cases cited: Costello v. Farrell, 234 Minn. 453, 48 N.W.2d 557, 29 A.L.R.2d 890 (1951), Hopwood v. Topsham Telephone Co., 120 Vt. 97, 132 A.2d 170 (1957), Sorrick v. Consolidated Telephone Company, 340 Mich. 463, 65 N.W.2d 713 (1954), Age

Pub. Co. v. Becker, 110 Colo. 319, 134 P.2d 205 (1943).

12. § 28–2915, D.C.Code (1961), as well as the Indiana statute, was first drafted as § 15 of the Uniform Stock Transfer Act. § 29–908g, D.C.Code (1961), as originally enacted or as amended by the

The Indiana Appellate Court in so ruling quoted in part from the opinion in Baumohl v. Goldstein, 95 N.J.Eq. 597, 124 A. 118 (ch. 1924), which plaintiff also cites. The latter case was brought by a corporation and two of its stockholders to impress a trust on certain of the corporation's stock, to require the transfer of that stock from one of the defendants to the corporation, and to enjoin the voting and transfer of that stock. A by-law of the corporation conditioned the right to transfer stock by a stockholder to the corporation's option to purchase it. The court upheld the validity of the by-law. One of the original stockholders transferred, with the consent of the corporation, his shares to his wife. Thereafter she sold and assigned those shares to another of the original stockholders without first offering them to the corporation in compliance with the by-law. When the purchaser of the shares sought to have them transferred to him on the books of the corporation, the action was instituted. The court found the purchaser to be in a position of trust and confidence with respect to the corporation since he was at the time of the purchase of the shares, and had been from the creation of the corporation, an officer and director. He was in no position to plead that he was innocent of the restricting by-law. In holding that § 15 of the Uniform Stock Transfer Act [13] did not support the assignee stockholder in his opposition to the complainants' motion for a preliminary injunction, the court stated:

> This act, of course, was designed for the protection of innocent purchasers of stock, in the open market or otherwise, and not at all as a shield by one with knowledge of a condition to unconscionably protect himself from the consequences thereof. * * * As has been said so often, laws are passed for the protection of rights and not

for the purpose of aiding in the perpetration of fraud. Id. at 600, 124 A. at 121.

But it is for the very purpose of aiding in the perpetration of the Garfield–Benn–5410 fraud that this Court is being asked to hold the purported transfer of stock to Benn–5410 valid because the Garfield-Sankin restrictive agreements were not disclosed on the stock certificates. In denying that request this Court "need look no further than the maxim that no man may take advantage of his own wrong." Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 232, 79 S.Ct. 760, 762, 3 L. Ed.2d 770 (1959).

And again Benn–5410 and the intervenor-defendants would have the May 1, 1958 stockholders' agreements declared invalid as being too indefinite. But those defendants in making such a contention have overlooked what the record discloses as to the origin and the purpose of those agreements, as well as the contracting parties' contemporary agreement with respect to those written agreements. The evidence adduced in this case makes known that in 1956 Garfield and Sankin individually bought the real estate on which the Garfield Apartments were subsequently built. In August of 1957 Garfield and Sankin as partners entered into a memorandum of understanding. So far as pertinent here that memorandum provides that an apartment house was to be erected on the premises; that Garfield was to have a 2/3 interest and Sankin a 1/3 interest in the profits and losses of the enterprise; that if Garfield and Sankin were the only stockholders in a corporation to be organized, the decisions to be made would be "on an equal basis regardless of interest."

In order to obtain F.H.A. financing two corporations were organized. Gar-

---

Act of July 23, 1959 (see note 10), would in no way alter the ruling in the *Doss* case since that section only relates to the extent of the statement that should appear on the stock certificate.

13. § 28–2915, D.C.Code (1961), see note 12.

field and Sankin, Inc. was to own the apartment house property. Julius Sankin, Inc. was to build the premises but not own them. To continue to maintain as near as possible their close relationship as partners, Garfield and Sankin entered into the May 1, 1958 stockholders' agreements. By the terms of those agreements each was to have an equal vote in the affairs of the two corporations regardless of the fact that Garfield owned ⅔ of the shares and Sankin owned⅓ of the shares and that the profits and losses were to be divided on that two-third and one-third basis. Moreover, each of the former partners, now the sole stockholders in the two close corporations, did not want to have forced upon him as a fellow stockholder someone who might be undesirable. Thus the stockholder agreements provided that if either stockholder wished to dispose of his stock in either corporation he would first offer *that stock upon thirty days written notice to the other stockholder.*

The pertinent provision of each of the stockholders' agreements reads:

3. It is further agreed by the undersigned that each stockholder and his heirs and assigns will not dispose of any of the shares without first offering same upon 30 days written notice to the other stockholder or stockholders.

Intervenor-defendants argue that that provision is indefinite and, therefore, invalid since it does not state the number of shares which the stockholder having the right of first purchase is privileged to buy. They contend that Sankin's effort to buy 16⅔ shares instead of all of Garfield's 66⅔ shares in each corporation is evidence of such indefiniteness. It is difficult to believe intervenor-defendants are serious in making such an assertion. The language is very clear that before Garfield could dispose of "any" of his shares he had to give Sankin 30 day written notice. Garfield in furtherance of his fraud gave Sankin no-

tice that he was going to dispose of all of his shares—although he erroneously stated that he *had* sold those shares to 5410. Sankin at first offered to buy 16⅔ shares in each corporation in order to preserve his equal voting position without question. Garfield refused to sell 16⅔ shares. Then Sankin within the period allowed purchased all of the shares owned by Garfield.[14] Thus Sankin exercised his first right to buy. The number of shares he was "privileged" to buy were the shares that Garfield wanted to sell—in this case purportedly all of his shares.

Nor is there anything to defendants' contention that Garfield could sell his shares to his heirs or assigns without first offering them to Sankin for a 30 day period—or as here until May 30. As has been shown from the record here Garfield and Sankin were originally partners. When in order to obtain F.H.A. financing they organized the two corporations, they considered their relationship as stockholders as close as it had been as partners. Neither wanted to have forced on him an undesirable fellow stockholder. But that protection would be lost if either could sell his shares to an heir or assign without first offering the stock to his fellow stockholder. However, if an heir acquired the shares through inheritance, or if an assign acquired through purchase in a case where the first purchase right was not exercised, the agreements provided that such heir or assign could not thereafter dispose of the acquired shares without first offering them to the other stockholders. See Bishop v. Vose's Estate, 162 F.Supp. 92 (D.Virgin Is.1958), aff'd, 264 F.2d 244 (3rd Cir. 1959), Black and White Cabs of St. Louis, Inc. v. Smith, 370 S.W.2d 669, 675 (Mo.App. 1963).

What Garfield did in executing the May 1, 1958 agreements, so far as the above quoted provision is concerned, was to give to Sankin a right of first re-

14. The purchase was made on May 26, 1959 more than 30 days after notice to Sankin, but Garfield and Benn–5410 had

agreed that Sankin could have until May 30 to exercise his purchase right. See supra p. 532.

fusal or pre-emption. That right in Sankin required Garfield, when he decided to sell his shares, to first offer them to Sankin either at a bona fide offer price or at a price based on reasonable value—to be discussed hereafter—and Sankin then had the election to buy or to forego purchasing the stock. Until Sankin elected not to buy, or until his 30 day election period terminated without his buying the stock—or in this instance until May 30, 1959—Garfield could not accept an offer made to him by a third party. Even if Garfield and Benn–5410 had been acting in good faith, it would have been a violation of duty for Garfield to have sold his stock to Benn–5410 on any terms—including a sale made subject to Sankin's right until the latter failed to exercise his pre-emption right within the time allowed. 1A Corbin, Contracts § 261, at 474, (1965); Wellmore Builders, Inc. v. Wannier, 49 N.J.Super. 456, 140 A.2d 422, 427 (App.Div.1958); Kaminsky v. Kahn, 13 A.D.2d 143, 213 N.Y.S.2d 786 (1961), Allen v. Biltmore Tissue Corporation, 2 N.Y.2d 534, 161 N.Y.S.2d 418, 141 N.E. 2d 812, 61 A.L.R.2d 1309 (1957), Model Clothing House v. Dickinson, 146 Minn. 367, 178 N.W. 957 (1920).

And finally Benn–5410 and the intervenor-defendants assert that the stockholders' agreements are uncertain and therefore invalid because they leave undetermined the amount the purchasing stockholder would have to pay for the stock in the exercise of his pre-emption right. If all there was to the agreements was the provision quoted above there might well be merit to this contention. However, the record makes evident that the May 1, 1958 written instruments did not constitute the entire agreement between Sankin and Garfield.

At the time the May 1, 1958 documents were being signed, counsel for the two corporations advised Garfield and Sankin that it was the practice in the District of Columbia to endorse on stock certificates voting and transfer restrictions. Garfield demurred to that practice being followed with respect to the stock of Garfield and Sankin, Inc. and Julius Sankin, Inc. The reason Garfield gave for his objection was that he did not want his wife to know about the restrictions. But he acknowledged that such restrictions were binding on the stockholders. Sankin agreed not to require the certificates to bear the restriction endorsements. And at the same time the parties orally agreed that the price to be paid for the stock by the purchasing stockholder in the exercise of his first right of purchase would be a bona fide price offered by a third party or the reasonable value of the stock at the time of the purchase if the selling stockholder had received no bona fide offer from a third party.

■ The record here makes clear that Garfield and Sankin did not adopt the May 1, 1958 written instruments as statements of their whole agreements. In such a case, "the law does not exclude proof by parol evidence of a contemporaneous agreement in addition to and not inconsistent with or a variation of a written agreement between the same parties." Brewood v. Cook, 92 U.S.App. D.C. 386, 388, 207 F.2d 439, 441 (1953); Murray v. Lichtman, 119 U.S.App.D.C. 250, 339 F.2d 749 (1964).

■ A contract is sufficiently definite for enforcement which provides that one who has the right of first purchase shall pay the price set by a bona fide offer. Gutch v. Meccia, 142 N.J.Eq. 430, 431, 60 A.2d 649, 650 (Ch.1948), R. F. Robinson Co. v. Drew, 83 N.H. 459, 461, 144 A. 67, 69 (1928), 5A Corbin, Contracts § 1174, at 289 (1964); 1A Corbin, Contracts § 261(5), at 470 (1963). Nor is the contract made indefinite by the alternative provision that, if a stockholder desired to sell and had received no bona fide offer from a third party, the purchasing stockholder in exercising his purchase right would pay the reasonable value of the stock at the time of purchase. Howard v. Fitzgerald, 58 Wash.2d 403, 405, 363 P.2d 386, 388 (1961), 1 Corbin, Contracts § 99, at 444, (1963).

The present assertion of Benn–5410 and the intervenor-defendants is diametrically opposed to their position before this action was instituted. Benn proposed to Garfield the $800,000.00 stock purchase price as a means of making it impossible or undesirable for Sankin to exercise his first purchase right. Benn–5410, through the secretary-counsel of 5410, confirmed in writing to Sankin that his "30-day option to purchase" expired May 30, 1959. The May 26, 1959 agreement between Benn and the five intervenor-defendants acknowledged Sankin's "30-day purchase option." Later that day and again on May 27, 1959, after Benn and the intervenor-defendants learned of Sankin's purchase of Garfield's stock, they did not protest that Sankin had no right to acquire that stock; their sole concern then was that the purchase price be paid to 5410 and not to Garfield. But Sankin's first purchase rights are as recognizable today as they were to Benn–5410 and the intervenor-defendants before this suit was filed. It is only their position which has changed and that is without support.

The 66⅔ shares of Garfield and Sankin, Inc. stock and the 66⅔ shares of Julius Sankin, Inc. stock which Garfield sold, assigned and transferred to Sankin on May 26, 1959, now in the registry of this Court, will be delivered to Sankin. He will pay Garfield the $800,000.00 purchase price less the amount of damages he sustained by the fraud worked upon him by Garfield–Benn–5410. The amount of the damages will be treated more particularly hereafter.

## II Intervenor-Defendants' Complaint in Intervention against Sankin and Garfield.

### Intervenor-Defendants' Counterclaim against Sankin.[15]

In their complaint in intervention, intervenor-defendants assert that they are the owners of all the capital stock of 5410 and that it is that corporation and not Sankin which owns what originally was Garfield's 66⅔ shares of stock in Garfield and Sankin, Inc. and 66⅔ shares of stock in Julius Sankin, Inc. They request that an order be entered transferring those shares, now in the registry of the Court, to 5410. In that connection they ask this Court to declare Sankin's first right of purchase to be legally unenforceable, or, alternatively, that Sankin did not validly exercise that right, or, as a second alternative, that, if Sankin did have a legal right to the stock and had validly exercised it, he be ordered to make payment to 5410.

By their counterclaims intervenor-defendants seek to have this Court find that Sankin conspired with Garfield to deprive 5410 of the original Garfield stock. They request that Sankin be required to render an accounting with respect to all financial transactions and activities of Garfield and Sankin, Inc. and Julius Sankin, Inc. since May, 1959. They further request that a judgment be entered in their favor against Sankin for both compensatory and punitive damages, as well as costs and attorneys fees.

In view of the judgment that is being entered for Sankin on his complaint, as well as what has heretofore

---

15. On October 8, 1959 complaint in intervention was filed. Plaintiffs' complaint was amended on October 21, 1959 to add the intervenors as defendants. In October, 1963 after several days of trial intervenors took the position that they were not defendants and cited a prior order which had been entered. The Court reaffirmed the holding that they were defendants and that they had been since October 21, 1959. Due to the confusion existing as to the prior order and intervenors' contention that they had not answered and were not prepared to defend against plaintiffs' complaint, a mistrial was ordered. Thereafter, on October 28, 1963 intervenor-defendant Pardo filed his separate answer, counterclaim and cross claim and on December 9, 1963 the other four intervenor-defendants filed their answer, counterclaim and cross claim. Intervenor-defendant Pardo on December 16, 1963 filed an amendment to his answer to plaintiffs' complaint.

been stated in this opinion about his rights and as to how he has been the victim of fraud, the claims of intervenor-defendants are without merit and their complaint in intervention and counter-claims will be dismissed with costs. As to their assertion that Sankin conspired with Garfield to deprive 5410 of Garfield's stock holdings in the apartment building enterprise, it is sufficient to state, that that assertion is without support in the record.

With respect to Garfield, the intervenor-defendants through their complaint in intervention, as modified at pretrial of May 29, 1962, seek affirmative relief.[16] They request that they be declared the sole owners of the stock of 5410; that Garfield be estopped from asserting claims detrimental to their interests as 5410 stockholders, including both efforts to void 5410's title to the stock Garfield formerly owned in the apartment building corporations and his claim of ownership of 100 shares of 5410 stock. And finally they pray that they be awarded compensatory damages.

 The relief sought by intervenor-defendants against Garfield will not be granted. "It is elementary, of course, that one seeking equity must do equity and must show 'clean hands' at the threshold." Udall v. Littell, 125 U.S.App. D.C. 89, 96, 366 F.2d 668, 675 (1966), cert. denied, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967). Here the record shows that the intervenor-defendants have unclean hands as a result of the fraud in which they joined Benn in perpetrating on Garfield.

 The relationship of the five intervenor-defendants to Benn and their purported purchase from him of 250 shares of 5410 stock have hereinbefore

been recited at length. Those facts make clear they knowingly entered into a conspiracy with Benn to take from Garfield the "dummy" corporation Benn had created for fraudulent purposes. Their protestations of their innocence in their testimony are not accepted by me. I find that they joined with Benn to defraud Garfield.

Intervenor-defendants' claims against Garfield being predicated on their own fraud against him shuts the doors of this Court to their plea for relief. Cochran v. Burdick, 67 App.D.C. 87, 90, 89 F.2d 831, 834 (1937); Brantley v. Skeens, 105 U.S.App.D.C. 246, 251, 266 F.2d 447, 452 (1959); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), rehearing denied, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945). And this Court may invoke the clean hands maxim "irrespective of whether the parties to the action urge it or not." Brantley v. Skeens, supra, 105 U.S.App.D.C. at p. 252, 266 F.2d at 453. Intervenor-defendants' complaint in intervention and counterclaim will be dismissed.

III *5410's Counterclaim against Sankin*

*5410's Cross claim against Garfield, Garfield and Sankin, Inc. and Julius Sankin, Inc.*

In its counterclaim and cross claim 5410 claims that Sankin and Garfield have misappropriated funds of Garfield and Sankin, Inc. and Julius Sankin, Inc. It demands an accounting of Sankin, Garfield and the two corporations and money judgments for such sums as an accounting might disclose as being owed by Sankin and Garfield to those two corporations.[17]

---

16. Both the answer of Pardo and the answer of the other four intervenor-defendants to plaintiffs' complaint set forth cross claims seeking additional relief against Garfield. Summary judgments on those cross claims were entered in favor of Garfield.

17. Garfield and Sankin, Inc. and Julius Sankin, Inc. filed no answers to the cross

claim against them. But at pre-trial (May 29, 1962), counsel for the two corporations stated that neither corporation would object to any accounting which the Court might order. All parties stipulated that such statement would constitute the answers of the two corporations.

At no time has 5410 owned any stock in Garfield and Sankin, Inc. or Julius Sankin, Inc. Garfield could not sell or assign his stock in those corporations to 5410 or anyone else as long as Sankin's first purchase rights were in being. Within the time permitted Sankin exercised his rights. Since May 26, 1959 he has owned the Garfield stock. Thus no accounting is due 5410 as a stockholder.

Nor can 5410 show itself to be a creditor or bear any other relation to Garfield and Sankin, Inc. or Julius Sankin, Inc., which might entitle it to an accounting as to the funds of those corporations by Sankin and Garfield. It is true that Benn has testified that the May 4, 1959 irrevocable assignment to him, acting for and on behalf of 5410, of all moneys due Garfield by the two corporations made 5410 a creditor. But that assertion is unsupportable for two reasons. First, as has already been found, Benn and Garfield together with 5410 perpetrated a fraud on Sankin and the purported irrevocable assignment was a spurious instrument serving as a means to that end. Secondly, assuming that that document was not conceived and born in fraud, the purported assignment was without consideration. All Benn–5410 gave to Garfield was three notes. Two notes for $540,000.00 and $60,000.00 were executed April 8, 1959. As provided in the stock purchase agreement, they evidenced the purported consideration for Garfield's 66⅔ shares of stock in Garfield and Sankin, Inc. The third note was in the amount of $200,000.00 and made on April 21, 1959. It represented the purported purchase price of Garfield's 66⅔ shares of stock in Julius Sankin, Inc. as the stock purchase agreement for those shares provided. Not only do the stock purchase agreements and the three notes show that the $800,000.00 was the purported purchase price of Garfield's stock and nothing more, but also Benn has admitted that fact in his verified answer to Garfield's cross claim against him and 5410.

(¶¶ 5, 8, Benn's Answer to Garfield's cross complaint.)

It was not until May 4, 1959 that Garfield executed the purported irrevocable assignment. It recited a ten dollars "and other good and valuable considerations" as being paid by Benn–5410. But the evidence shows that neither Benn nor 5410 paid even the ten dollars let alone furnished any "other good and valuable considerations." That the assignment, if it were valid, would be valuable can be appreciated from the claim asserted in this case by Garfield that at least $190,000.00 is owed him by Garfield and Sankin, Inc.

5410 is neither a stockholder nor a creditor of either Garfield and Sankin, Inc. or Julius Sankin, Inc. And the record would support no other claim of 5410 to any legal or equitable interest in the funds or property of either corporation. In short, 5410 has made no showing for this Court to exercise its equitable jurisdiction to order an accounting.

But even if equitable jurisdiction did exist this Court would not order an accounting. 5410 has been found to be an active participant with Benn and Garfield in perpetrating a fraud on Sankin to deprive him of his first purchase rights. This Court would not aid and abet 5410 in that fraud by ordering Sankin to account. To do so would be to disregard the unclean hands doctrine. Cochran v. Burdick, 67 App.D.C. 87, 90, 89 F.2d 831, 834 (1937). And it would shut its doors to the accounting relief sought against Garfield even though he was 5410's partner in fraud. Hopp v. Calloway, 52 App.D.C. 3, 4–5, 280 F. 977, 978–979, (1922); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, rehearing denied, 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005 (1945). The parties need not have raised this barrier for the Court to apply it. Brantley v. Skeens, 105 U.S.App.D.C. 246, 251, 252, 266 F.2d 447, 452, 453 (1959).

5410's counterclaim and cross claim will be dismissed.

## IV *Garfield's cross claim against Benn and 5410*

By his cross claim against Benn and 5410, Garfield requests this Court (1) to direct a complete recision of all transactions and uncompleted transfers which had been entered into and agreed to by Garfield, Benn–5410; (2), alternatively, to declare null and void all uncompleted transfers as well as all agreements between Garfield and Benn–5410; (3), as a second alternative, to declare Garfield to be the sole and legal stockholder of 5410, with the purported amendment to 5410's articles of incorporation increasing the stock to 250 shares declared null and void. Garfield also requests that Benn and 5410 be ordered to account for monies which they, or either of them, have diverted from Garfield and Sankin, Inc. and Julius Sankin, Inc. And finally Garfield seeks an order enjoining Benn and 5410 from enforcing or seeking to enforce any agreements, assignments or other documents executed by Garfield which purport to affect his interests in Garfield and Sankin, Inc. and Julius Sankin, Inc.

In contending that he is entitled to an order rescinding his agreements and transactions with Benn–5410, Garfield asserts that on May 21, 1959 he and Benn effected such a recision. The record does not support that contention. On that date, Garfield and Benn engaged in a telephone conversation. Garfield testified that he called Benn "all kinds of names and asked him to return everything to its original state." But, according to Garfield, Benn stated, "I can't do that." For several days following that conversation counsel for Benn and counsel for Garfield discussed settlement. That agreement was never executed; in fact, negotiations by counsel terminated in acrimony. Thus without merit is Garfield's argument that, the parties having agreed to a recision, the Court should declare it to be a fact pursuant to the maxim "equity regards as done that which ought to be done."

Garfield by his own admission entered into the transactions and agreements with Benn–5410 with a fraudulent intent to accomplish a fraudulent end. Courts of equity do not grant relief to one who has so soiled his hands. This Court will not. Hopp v. Calloway, 52 App.D.C. 3, 4–5, 280 F. 977, 978–979 (1922), Brantley v. Skeens, 105 U.S.App. D.C. 246, 251, 266 F.2d 447, 452 (1959).

Garfield would extricate himself from this result by arguing that Benn–5410 is being unjustly enriched. Garfield cites Hurwitz v. Hurwitz, 78 U.S.App.D.C. 66, 136 F.2d 796, 148 A.L.R. 226 (1943) and Wantulok v. Wantulok, 67 Wyo. 22, 214 P.2d 477, 223 P.2d 1030, 21 A.L.R.2d 572 (1950). But Garfield is no innocent heir of a fraudulent grantor as in *Hurwitz*. He with Benn–5410 was an evildoer.

Nor is Garfield like the plaintiff in *Wantulok* who sought to have the grantee of a conveyance declared trustee and to have him reconvey with title quieted in her. She and her deceased husband some thirteen years before the action was brought conveyed certain real estate to the husband's brother. They did so in the belief that their property was threatened with potential judgments arising out of medical and funeral bills incurred in connection with the last illness and death of an adult daughter. The grantors were of the view that they owed the money which was a doubtful conclusion. The grantee had agreed to reconvey the property at a future time. For eleven years the grantee made no claim to the property. During that period plaintiff paid all debts and expended sums improving the property. She and her husband were uneducated and little conversant with the laws. The husband was a coal miner and the plaintiff hired out as a cook to obtain the money to pay the deceased daughter's medical and funeral bills. As a witness her testimony had to be taken through an interpreter. The property conveyed which was valued at $11,000.00 benefited from a $2500.00 homestead exemption. The medical and funeral bills of the adult child totalled

$1400.00. No other debts were owed by plaintiff and her husband. The grantee was found to have given no consideration for the property. Under the entire circumstances of the case, the Wyoming Supreme Court held that the resulting unjust enrichment to the deceased husband's brother as grantee was a far more serious consequence in the eyes of equity than the clean hands maxim and it ordered the grantee to reconvey to the plaintiff.

Unlike Mrs. Wantulok, Garfield is an educated man, a law school graduate who has been admitted to the bar. While not engaged in the practice of law, he has been successful in business with extensive property holdings and has served as a chief executive of a gas distribution property. He knew Benn to be an unscrupulous man with whom he had prior unsatisfactory business dealings. Yet he deliberately contacted Benn for the purpose of seeking his assistance in depriving Sankin of the very rights Garfield contracted Sankin should have. He only sought legal advice after he discovered that Benn had defrauded him while aiding him in working a fraud on Sankin. And unlike Mrs. Wantulok who paid the bills which she probably did not owe, Garfield even after obtaining legal advice required Sankin to buy his stock at a fraudulently inflated price. It would take more than an interpreter for Mrs. Wantulok to recognize Garfield as kin of hers.

But even if Garfield and Mrs. Wantulok were in parallel positions, it would be difficult to conclude that Benn–5410 has been unjustly enriched. It has already been held here that the purported stock transfers by Garfield to Benn–5410 were ineffective. Sankin had until May 30, 1959 to exercise his right of first purchase; until that date Garfield was unable to transfer his stock to another. Sankin legally exercised his right and he has been the owner of the Garfield stock since May 26, 1959 when it was sold, assigned and transferred to him by Garfield. Garfield will be paid the reasonable value of that stock. The stock certificates are in the registry of this Court and an order will be entered delivering them to Sankin and directing Garfield to execute all necessary instruments in order that they may be cancelled and new certificates registered in the name of Sankin.

The other instrument of claimed value executed by Garfield was the purported irrevocable assignment of moneys owed Garfield by Garfield and Sankin, Inc. As has been stated that assignment, even if otherwise legal, was without consideration. It is difficult to see how that instrument, which bears none of the attributes of a negotiable instrument, could enrich 5410 and its stockholders whomever they might be. Certainly Garfield and Sankin, Inc. would not be justified in honoring it, particularly in light of the rulings made in this case.

Garfield asserts that he is the owner of the entire 100 shares of 5410's stock and that the April 28, 1959 amendment of that corporation's articles of incorporation increasing the capital stock to 250 shares was null and void. He claims that he not only subscribed for but actually purchased the entire issue of 100 shares of stock authorized by the original articles of incorporation and that, therefore, the purported amendment of the articles to increase the number of shares was null and void. In supporting his position he cites § 29–921h, D.C.Code (1961) which provides that, once there has been a subscription for shares, the articles may be amended only on an affirmative vote of two-thirds of the outstanding shares entitled to vote. He did not vote his shares nor did he authorize anyone to vote them on his behalf.

While I find from the evidence that Garfield on April 20, 1959, paid Benn $1,000.00 for the entire 100 shares of 5410 stock, 5410's minute book shows no action by the board of directors with respect to the subscription for that stock or purchase of it by Garfield. Thus it was within the letter of § 921g, D.C.Code (1961) for the original incorporators to amend the articles of incorporation to

provide for the issuance of 250 shares of 5410 stock and § 29–921h does not apply. No order will be entered declaring Garfield the sole owner of the shares of 5410.

Insofar as Garfield seeks a decree that he is the equitable owner of 5410's stock because of Benn's fraud, I leave him with Benn his compatriot in the land of fraud. He knew that 5410 was a "dummy" corporation created to defraud Sankin. While he paid $1,000.00 for 100 shares of stock he allowed Benn to appear as the owner for the purpose of deceiving Sankin. He complains now because Benn outmaneuvered him. Let him stay where he placed himself.

■ Nor will an order be entered directing Benn and 5410 to make an accounting for moneys diverted from Garfield and Sankin, Inc. and from Julius Sankin, Inc. Applying the clean hands maxim Garfield will be left where he placed himself—a participant with Benn–5410 in a fraud. It was Garfield who on April 21, 1959 advised Sankin he had sold his interest in the apartment project to Benn–5410. It was Garfield who told Sankin that the latter would thereafter have to deal with Benn. It was Garfield who resigned as a director and officer of each of the apartment corporations with the result that Benn took his place in the offices and on the board. Thus Benn as an officer and director was in a position to and did, through coercion and threats of receiverships, improperly gain the $24,000.00 Garfield now complains about.

Garfield's cross claim against Benn and 5410 will be dismissed.

### V. Intervenor-Defendants' Cross Claim against Benn

By their cross claim the intervenor-defendants seek, in light of the rulings made, to recover a judgment against Benn in the sums paid by them in their purported purchase of 5410 stock with interest and the return of their notes marked cancelled, or, if those notes have been negotiated, a judgment equal to the amount of their notes.

■ They assert that if Benn should be found guilty of fraud, as he has been, they were innocent of it. Their innocence, they say led them to purchase 5410's shares in the belief that it owned Garfield's stock in the apartment corporations and Garfield's credits. This Court has already found them to be not innocent and unwary but locked in a conspiracy with Benn to defraud Garfield. What they purchased, in the words of Betoff, was a "gift horse" in whose mouth one did not look. This Court leaves the intervenor-defendants with their purchase and their cross claim will be dismissed.

### VI. Benn's Cross Claim against Joseph Garfield, (Civil Action 1493–59)

Benn's Complaint against Janet Garfield, (Civil Action 4002–60)

In his answer to Sankin's complaint in Civil Action 1493–59, Benn asserted a cross claim against Joseph Garfield through which he seeks to recover $60,000.00 which he alleges was stolen from him by Garfield.

By his complaint filed in Civil Action 4002–60, Benn asserts a claim against Janet Garfield for $60,000.00 which he alleges she stole from him.

On motion of Benn the cross claim and complaint were consolidated for trial.[18]

■ I have heretofore found as a fact that Benn had had returned to him by Janet Garfield the entire sum of money which was in his brief case that she took on May 8, 1959. The credible evidence on which that finding is based shows that on May 5 or May 6, 1959,

---

18. The cross claim and complaint were limited to the recovery of $60,000.00. The pre-trial order limits the issue to the recovery of that amount. That was the issue tried. In his brief Benn argues for recovery of damages for all of the contents of his brief case, including the $60,000.00. At trial Benn testified he could only remember the money and certain alleged promissory notes being in the brief case. Benn did not seek to amend his pleading to enlarge the issue. If he had, the evidence would not have justified such amendment.

Herman Mankes, while in Miami, informed Garfield that Benn had taken $24,000.00 from the Garfield apartment enterprise. On May 7, Garfield called Benn, who was then in Washington, and charged him with taking the money. Benn denied the theft. Garfield also told his wife of what Mankes had advised him. Janet Garfield then called Benn and asked him to come to Florida.

On May 8, Benn arrived by plane about 2 p. m. Janet Garfield met Benn at the airport and the two of them drove in separate cars to Garfield's home in Coral Gables, both arriving at the same time. At the Garfield home, Benn was again charged with the theft which he denied. Benn, when asked by Garfield if he had brought with him Garfield's canceled checks, which, according to Garfield, evidenced his advances to the apartment enterprise, stated that they were in Washington. It was during this conversation that Benn and Janet Garfield revealed the affair in which they had been involved.

About 4 P. M. on May 8, Janet Garfield took Benn's brief case, which she believed contained Garfield's checks and files, and drove to her brother's home. While there, she was advised in a telephone conversation with Garfield, that Benn claimed there was $200,000.00 in currency in the brief case. In disbelief, Janet Garfield looked into the brief case and found two Manila envelopes sealed with scotch tape. She tore the corner of one envelope and noted that it contained currency. She did not look into the other envelope but assumed it also contained currency in view of Benn's statement to her husband. She at no time ever removed the currency; in fact she never opened either envelope. She at no time counted the money and never knew the total amount. (Benn later asserted the money totalled $120,000.00, $60,000.00 in each envelope.) Janet Garfield, after secreting the brief case and its contents in her brother's home, returned to her own home about 11 P. M. Between that hour and 4 A. M. on May 9, Benn and the two Garfields entered

into extended discussion concerning the return of Benn's brief case to him and the return to Garfield by Benn of Garfield's papers as well as the $24,000. The Garfields also demanded that Benn rescind the fraudulent transaction in which he and Garfield had been engaged.

Later in the morning of May 9 the three continued the discussion of the evening before. About 2 P. M. Benn called the Coral Gables police and charged the Garfields with robbing him. The police, after investigating the matter, took no action, leaving it instead to the parties to work out. The police, however, were forcibly removing Benn from the Garfield home until Janet Garfield prevailed upon them to let Benn return.

Following the departure of the police and further discussions, Benn offered to give Garfield a certificate for 100 shares of 5410 stock in order that Garfield might possess evidence of ownership of the corporation. Benn and Garfield went to a public stenographer at the Columbus Hotel and Janet Garfield drove to her brother's home where she picked up the brief case. She then took it to her own home and took out of it Garfield's papers and checks and one Manila envelope. After depositing that material in the attic of her home she drove to the Columbus Hotel to meet her husband and Benn. She took with her Benn's brief case and the remaining contents; that is the second Manila envelope and the papers which did not belong to Garfield. When Janet Garfield arrived at the hotel Benn had, or was in the process of endorsing a restricted certificate for 100 shares of 5410's stock to Garfield and having Garfield sign a letter to Riggs Bank. When Janet Garfield saw the letter she took it from Benn and tore it up so that it could not be mailed as she considered it a further instrument of Benn's fraud. At the hotel, she gave Benn his brief case and contents, including the one taped envelope.

Benn and the two Garfields then returned to the Garfield home where Benn made out a receipt to Janet Garfield for the returned brief case and its contents,

including $120,000.00. At that time, Janet Garfield returned the second taped envelope. Thus Benn had returned to him by Janet Garfield the money for which he sues here; money which Garfield at no time had.

I reach this conclusion and make these findings on the credible evidence. I find Benn's testimony unworthy of being credited.

Benn testified that he was asked to travel to Florida on May 8, 1959 by Janet Garfield to help her and her husband who were being harrassed by Mankes; that when he arrived he was told that Mankes had advised Garfield that unless Benn signed the minutes of the annual meeting of Garfield and Sankin, Inc. and Julius Sankin, Inc. and the Federal corporation income tax returns for the year ending February 28, 1959, Mankes would work economic damage on his nephew Garfield. According to Benn he was unwilling to sign those documents without verification of large expenditures of corporate funds. And since he would not sign as an officer of the Garfield apartment corporation, Benn contends his brief case and contents were stolen from him. He admits that after he endorsed the May 9, 1959 restricted stock certificate for 100 shares of 5410 stock to Garfield, one envelope containing $60,000.00 was returned to him. However, he claims that he has never had returned to him the remaining $60,000.00 because of his continuous refusal to sign the minutes and tax returns. The receipt, which he acknowledges making to Janet Garfield, he claims was the result of his being coerced by the Garfields.

The evidence of record shows Benn's contention to be incredible. Sankin testified that not only was Benn not asked to sign the corporations' minutes of the meetings of stockholders but that there were in fact no annual meetings held at any time from the organization date of the two corporations in May, 1958 to the date Sankin testified in this case. The by-laws of Garfield and Sankin, Inc. and Julius Sankin, Inc. provide that "[a]nnual meetings of shareholders, commencing with the year 1959, shall be held on the second Tuesday of April, if not a legal holiday, and if a legal holiday, then on the next secular day following * * *." In the case of each corporation the minutes of an April 30, 1959 meeting of the board of directors show that the annual meeting of stockholders was set for June 19, 1959. This was done, according to Sankin, in order that such meetings would be held after his first purchase rights had expired. The April 30, 1959 minutes show that Benn was present at the board meeting of each corporation and that he signed those minutes.

Sankin also testified that Saunders, Benn's tax counsel as well as secretary-counsel for 5410, stated on or about May 7, 1959, that Benn would not sign the income tax returns for the corporate years ending February 28, 1959 because Benn knew nothing of the corporations' operations for that period. Being so advised the accountant for Garfield and Sankin, Inc. and Julius Sankin, Inc. obtained an extension of time for filing the returns. Thus on May 8, and May 9, 1959 when Benn was in Florida, there was no problem with respect to those returns.[19]

19. Benn stated to the Court that one Frederick Silver of New York City would be called by him to testify that on May 13, 1959, Janet Garfield called Silver and told him that she had Benn's $60,000.00 and that she would return it when Benn delivered to her and her husband certain papers relating to an apartment building property in Washington, D. C. The trial of the consolidated Benn cross claim and complaint was held on December 22 and 23, 1964 and January 4 and 5, 1965. On December 22, Benn advised the Court that Silver would be available as a witness on December 23. Silver did not appear; his absence was not explained by Benn. When the trial was resumed on January 4, 1965, following the Christmas recess, Benn stated to the Court that Silver and his wife decided to take a West Indies cruise during the holidays; that Silver had had a heart attack recently; that Benn had talked to Silver over the telephone on January 1 while Silver's ship was docked in Nassau. Silver advised Benn, according

Joseph Garfield never having had any of Benn's claimed $120,000.00 and Janet Garfield having returned it to Benn, the cross claim against Garfield and complaint against Janet Garfield will be dismissed.

## VII *Damages—Compensatory*

Following the trial of the liability issues, the filing of briefs by counsel and parties and an oral statement by the Court as to how it intended to rule as to liability, an order of reference to a Special Master was entered herein. That order submitted to the Special Master the issue of all damages, except punitive damages, attorneys fees and costs, suffered by the plaintiff as a result of the frauds of Garfield, Benn and 5410, including a determination of the reasonable value as of May 26, 1959 of Garfield's 66⅔ shares of stock in Garfield and Sankin, Inc. and his 66⅔ shares of stock in Julius Sankin, Inc., as well as an accounting for any monies or other assets of Garfield and Sankin, Inc. and Julius Sankin, Inc. which had come into the possession of any of the defendants, including intervenor defendants Pardo, Whiting, Betoff, Winn and Link, now deceased but represented here by his executrix.

Having concluded that the issue of damages, particularly the determination of the reasonable value of Garfield's capital stock in the two corporations as of May 26, 1959, was a complicated and difficult matter, the Court appointed, pursuant to Rule 53, Federal Rules of Civil Procedure, William J. Durkin, a member of the bar of this Court and a certified public accountant, as Special Master. He conducted hearings for a period of twenty-two days which resulted in over 2000 pages of transcript. Following the filing of briefs and argument of counsel, the Special Master prepared and filed with the Clerk of this Court on July 7, 1967, his report, findings of fact and conclusions of law. Thereafter plaintiff Sankin and defendants Garfield, 5410, Benn and Pardo served and filed their written objections together with their motions based on those objections. A hearing was held by the Court with respect to those objections and motions.

The Court having considered the Special Master's report, findings of fact and conclusions of law and the objections filed thereto, as well as argument of counsel, adopts the report, findings of fact and conclusions of law, except as hereinafter noted.

 Of the objections filed but a few need be mentioned. Sankin objected to the Special Master's finding that the reasonable value of Garfield's stock pur-

---

to the latter, that his ship would dock in New York before noon January 4 and that he would come to Washington to testify unless it was physically impossible for him to do so, in which event he would give his deposition. Benn was advised by the Court that if Silver appeared on January 5, he could be heard but that the trial would not be continued to permit the taking of the deposition. The Court was then advised that Benn had another witness whom he might not call if Silver appeared. On January 5 Benn advised the Court that Silver could not appear because of his health. But Benn did not call the other witness he stated he would be calling if Silver did not appear. January 5, 1965 being the last day of the trial on the liability issue, which had been proceeding daily since October 19, 1964, the Court refused to continue the trial for Benn to take Silver's deposition.

Benn could not have been surprised in December 1964 and January 1965 as to Janet Garfield's testimony that she returned the entire $120,000.00 to Benn on May 9, 1959. In civil action 4002–60 her deposition was taken on December 28, 1961 at which time she testified, as she did at the trial, as to her taking the brief case and thereafter returning it with one envelope of money to Benn at the Columbus Hotel and at her home returning the second envelope, at which time Benn gave her a receipt. Benn had plenty of time to take Silver's deposition between December 28, 1961 and December 22, 1964. And in that connection it is to be noted that to assure himself of the claimed Silver testimony Benn should have done so since this Court's subpoena would not have reached Silver in New York.

chased by Sankin was $376,479.00 on May 26, 1959. In part this value was arrived at by the Special Master capitalizing the income of the Garfield Apartments. Sankin, in objecting to the results of the Special Master's computation of the reasonable value of the equity in the apartment building, contended that the outer and upper limit of such value was the reproduction cost of the building. An examination of the report shows that the Special Master considered and rejected the reproduction cost method. His application of the capitalization method is supported by the evidence. Moreover, only if the Special Master's report was clearly erroneous should it be set aside. It was not. Rule 53(e), F. Rules of Civ.P., Dyker Building Co. v. United States, 86 U.S.App.D.C. 297, 299, 182 F.2d 85, 87 (1950); Hepner v. Chozick, 111 U.S.App.D.C. 338, 339, 296 F.2d 595, 596 (1961).

█ Sankin also complained of the Special Master capitalizing the apartment house income at 7.21%. But again the record supports this finding by the Special Master. It will not be set aside.

█ Sankin also objected to the Special Master's finding and conclusion that in determining the reasonable value of the Garfield stock that value should not be discounted because of the voting and transfer restrictions. The Special Master stated that those limitations would definitely be factors for consideration if the sale was made to a third party who did not already own the other one-third

interest in the capital stock as did Sankin on May 26, 1959. An examination of the record shows that Sankin himself testified on this subject as did Arthur M. Chaite. But their testimony is neither conclusive nor persuasive that a discount should apply in this instance. There being no other testimony in the record as to what would be the rate of discount, if one were to be applied, it would be pure conjecture to discount the value of Garfield's stock in any amount. The Special Master's conclusions not to discount the value of the Garfield stock will not be disturbed.

Sankin's other objections do not merit discussion.[20]

Garfield also objected to the Special Master's valuation of the apartment house property. Garfield contended that the value placed upon property by the Special Master is too low. But as stated before, there is evidence to sustain the Special Master's finding. Not being erroneous it will not be disturbed.

█ In computing the valuation of the stock of Garfield and Sankin, Inc. the Special Master found that corporation's promissory note of May 1, 1958, in the amount of $73,062.00 with interest at 5% per annum made payable to Garfield and Sankin individually was properly includible in the liabilities of Garfield and Sankin, Inc. Garfield objected to that finding on the grounds that (1) the note is non-negotiable; (2) it need not be paid in part or in full until May 1, 1999; (3) interest, which can only be

---

20. On page 28 of the Special Master's Findings of Fact and Conclusions of Law he treats with certain of Sankin's claims for compensatory damages. In discussing Schlein v. Smith, 82 U.S.App. D.C. 42, 160 F.2d 22 (1947), he stated that the plaintiff there was an ignorant woman upon whom a gross fraud had been perpetrated and the Special Master then added that this Court in this case has stated that: "There were no unwary and innocent in this case", citing pages 6054–6063 of the transcript. A reading of the first paragraph of page 6054 makes clear that the quoted sentence was used only in connection with the Court's find-

ing that all parties to this action were aware of the restrictions on the voting rights of the Garfield and Sankin, Inc. stock and the Julius Sankin, Inc. stock. As the rest of the Court's oral statement (Tr. 6054–6063) makes known, and as has been more fully set forth in this opinion, it was found that Sankin was an innocent victim of the fraud perpetrated by Garfield, Benn–5410. In all other respects the Special Master's Findings of Fact and Conclusions of Law respecting Sankin's Claim for compensatory damages are adopted. (pp. 27–29, Special Master's Report, Findings of Fact and Conclusions of Law.)

paid out of cash surplus, can be deferred until May 1, 1999; (4) the note cannot be accelerated even if the apartment house project is refinanced with conventional financing; and (5) the note is not secured. But the record shows the note was made by Garfield and Sankin, Inc. and signed by Garfield as president. It is obviously a liability of the corporation and was properly included as such by the Special Master.

Nor is there any basis for modifying the Special Master's finding that no interest is to be paid by Sankin to Garfield by reason of Sankin's May 26, 1959 purchase of Garfield stock.

Except in so far as Benn's objections go to the Special Master's finding of his indebtedness to Garfield in the sum of $23,839.42, his objections and those of 5410 and Pardo are without merit and deserve no discussion.

The Special Master found Benn to be indebted to Garfield in the sum of $23,-839.42. This resulted from Benn taking from Garfield and Sankin, Inc. the sum of $24,000.00 on April 24, 1959 without right. From that amount the Special Master deducted $158.03, the cash balance in 5410's checking account in The Riggs National Bank. In stating that account the Special Master was acting pursuant to the order of reference. By that order there was submitted to the Special Master the issue of all damages, excluding punitive damages, attorneys' fees and costs, suffered by Garfield as a result of the frauds of Benn, 5410 and the five intervenor-defendants. That submission was in keeping with this Court's oral statement of July 26, 1965 that it intended to rule that 5410's stock ownership would be in Garfield and that the damage issue of Garfield's claim against Benn and 5410 for $24,000.00 would be submitted to the Special Master.

On reflection I have concluded that to rule that Garfield was the owner of 5410's stock and to award damages against Benn and 5410 would be in error. As hereinbefore stated at length in part IV of this opinion, Garfield's cross claim against Benn and 5410 will be dismissed because to grant it would violate the clean hands maxim. It was by that cross claim that Garfield sought to have this Court declare him to be the owner of the stock of 5410 and to recover the $24,000.00 taken by Benn from the funds of Garfield and Sankin, Inc.

The Garfield cross claim being dismissed, the Special Master's report, findings of fact and conclusions will be modified by rejecting that part of the report appearing on pages 29 and 30 which deals with Garfield's cross claim against Benn and 5410 and by rejecting paragraph 18 of the summary of findings and conclusions which appears on page 32 of the report. In all other respects the Special Master's report and recommendations are approved and the findings of fact and conclusions contained in the report are adopted as those of this Court and are by this reference made a part of this opinion.

Having approved and adopted the Special Master's report, findings and conclusions, as modified, Sankin will be awarded compensatory damages against Garfield in the amount of $423,521.00, which amount shall abate his liability for the payment of $800,000.00 as evidenced by his non-interest bearing notes to Garfield; that upon payment into the Registry of this Court of the abated balance of $376,479.00, Sankin will have satisfied in full his liability to Garfield on account of Sankin's purchase of Garfield's 66⅔ shares of stock of Garfield and Sankin, Inc. and 66⅔ shares of stock of Julius Sankin, Inc.; that upon the payment of said $376,479.00 into the Registry of this Court, the Clerk of the Court will deliver to Sankin the stock certificates representing such shares now in the Registry of the Court.

The judgment of this Court will also require Garfield to deposit in the Registry of the Court the three promissory notes made by Sankin to Garfield on May 26, 1959 in the total amount of $800,-000.00. The Clerk of the Court when delivering the stock certificates to San-

kin will also deliver those three notes to him.

██ While the $423,521.00 awarded Sankin against Garfield compensates him for his pecuniary loss, Sankin's legal rights were also technically violated by Benn and 5410 through the fraud which they together with Garfield worked on Sankin. For those violations Benn and 5410 are each assessed $1.00 nominal damages in favor of Sankin. Chesapeake & Potomac Tel. Co. v. Clay, 90 U.S.App. D.C. 206, 208, 194 F.2d 888, 890 (1952).

At the time this action was filed The Riggs National Bank was made a party defendant for the reason that it, as escrow agent, was holding Garfield's 66⅔ shares of stock of Garfield and Sankin, Inc., and 66⅔ shares of stock of Julius Sankin, Inc. A July 19, 1959 order of this Court dismissed with prejudice this action against the Bank and it provided that the stock the Bank held should be deposited into the Registry of this Court and thereafter the Bank would be discharged from all further liability to any of the parties to the action on account of or by reason of the escrow agreements. By a further provision of that order, this Court retained jurisdiction to consider, fix and award to The Riggs National Bank, its attorneys' fees and reasonable expenses on account of its conduct as escrow agent.

On March 14, 1960 another order was entered by this Court allowing The Riggs National Bank attorneys' fees in the amount of $3,500.00. That order provided that the Bank should have a lien against the Garfield stock certificates and that until the attorneys' fees were paid the stock certificates were not to be discharged from the Registry of the Court. The final determination as to which of the parties to the action should be responsible for the payment of the $3,500.00 attorneys' fees to the Bank was to await a final determination by this Court of this action.

As has been stated hereinbefore, there were two escrow agreements which are involved in this case. The first escrow

agreement was entered into on April 8, 1959. The parties were Garfield, 5410 Connecticut Avenue Corporation, a then non-existing corporation for which Benn signed as "President Pro-tem", and the escrow agent, The Riggs National Bank. By that agreement Garfield deposited with the Bank his 66⅔ shares of stock in Garfield and Sankin, Inc. and the non-existing 5410 deposited with the Bank two nonnegotiable promissory notes totaling $600,000.00.

The second escrow agreement is dated April 21, 1959. The parties were the same as named in the April 8 agreement, except that in the interim 5410 was incorporated, although Benn still signed as "President Pro-tem." By the terms of the April 21, agreement Garfield deposited with the Bank his 66⅔ shares of stock in Julius Sankin, Inc. and 5410 deposited with the Bank one nonnegotiable promissory note in the face amount of $200,000.00.

██ In the case of both agreements Garfield and Benn-5410 agreed to indemnify the Bank against all expenses to which it might be put as a result of consulting with counsel of its own choice in connection with the escrow agreements. In view of their express promises to indemnify the Bank for attorneys' fees, Garfield, Benn and 5410 are obligated to pay the $3,500.00 attorneys' fees allowed the Bank by this Court's March 14, 1960 order. A judgment to that effect will be entered herein.

However, the entry of such a judgment will not remove the lien impressed on the stock certificates in the Registry of the Court. And the March 14, 1960 order of this Court impressing that lien provides that the stock certificates shall not be discharged from the registry of the Court until the $3,500.00 has been paid to The Riggs National Bank. But as has been determined, Sankin is entitled to those stock certificates upon his depositing in the Registry of this Court $376,479.00 and he is entitled to that stock free of all liens. Therefore, if, within 10 days after the entry herein of the Court's

final order, judgment and decree, The Riggs National Bank has not filed with the Registry of the Court its receipt showing payment to it of $3,500.00, the Clerk of this Court shall pay from the $376,479.00 deposited by Sankin $3,-500.00 to the Bank and take its receipt therefor. In such an event Garfield may pursue whatever rights he might have against Benn and 5410.

VIII *Punitive Damages, Attorneys' Fees, Costs*

In addition to compensatory damages Sankin seeks punitive damages. It has been said by the Supreme Court that " * * * the doctrine is well settled that in actions of tort the jury, in addition to the sum awarded by way of compensation for the plaintiffs' injury, may award exemplary, punitive or vindictive damages, sometimes called smart money, if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations." Lake Shore, etc. Railway Co. v. Prentice, 147 U.S. 101, 107, 13 S.Ct. 261, 263, 37 L.Ed. 97 (1893). And the Court of Appeals for this Circuit has stated: "That punitive damages have a proper place in a civil case as a punishment of, and as a deterrent to, various forms of wrongful behavior has long been recognized by the federal courts including this court." Brown v. Coates, 102 U.S.App.D.C. 300, 303, 253 F.2d 36, 39, 67 A.L.R.2d 943 (1958).

■■■ The conduct of Garfield and Benn–5410 as hereinbefore recited makes apposite here the long since spoken words of Justice Story: "Upon the facts disclosed in the evidence, this must be pronounced a case of gross and wanton outrage, without any just provocation or excuse." The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 558, 4 L.Ed. 456 (1818). The actual malice of Garfield and Benn–

5410 makes this an appropriate case to award punitive damages.

■■■ As an element of such damages, Sankin seeks an allowance for attorneys' fees. In circumstances such as exist here, it is proper to award counsel fees as punitive damages. Schlein v. Smith, 82 U.S.App.D.C. 42, 45, 160 F.2d 22, 25 (1947), Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 83, 366 F.2d 649, 662 (1966). However, Sankin has disclaimed any intent to seek attorneys' fees in the form of punitive damages from Garfield. He acknowledges that he has settled with Garfield with respect to attorneys' fees.[21] But he contends that such settlement did not release anyone else.

The settlement with Garfield was a result of the May 26, 1959 indemnity agreement and a 1960 memorandum of understanding between Sankin and Garfield. As stated hereinbefore when Sankin purchased Garfield's stock on May 26, 1959 for $800,000.00 he, of course, knew that Garfield claimed to be the owner. However, he was also aware of Benn's adverse claim. Indeed Benn had advised Sankin that the latter could only purchase the stock from Benn. Thus with Garfield and Benn each claiming to own the stock and with the time running out in which Sankin could exercise his first right of purchase, he did the prudent thing on May 26 and required an indemnity agreement from Garfield. That agreement, among other things, provided that Garfield would indemnify and hold harmless Sankin from and against all damages, loss, costs and expenses arising out of any claim, demand, action or cause of action asserted against Sankin as a result of any and all transactions between Garfield and Benn or 5410 relating to the sale by Garfield of his stock to 5410, or relating to Sankin's purchase of the stock from Garfield.

---

21. In his reply to the memoranda of Benn and Garfield opposing Sankin's motions for punitive damages, attorneys' fees and costs Sankin stated: "it was not intended that the Plaintiff's Motion for Attorney's Fees would apply to Garfield. It is quite clear that Mr. Sankin entered into a settlement agreement with Mr. Garfield which is an exhibit in this case as Interveners (sic) Exhibit 10."

As a result of differences concerning the proper interpretation of the May 26, 1959 indemnity agreement, Garfield and Sankin on October 19, 1960 entered into a memorandum of understanding as to their respective rights and obligations. Pursuant to the agreement as interpreted by the memorandum, Garfield has paid over $20,000.00 on behalf of Sankin's attorneys' fees and costs.

Sankin has disclaimed any intent to secure further attorneys' fees from Garfield either under their agreement or by way of punitive damages. But an affidavit of Sankin's counsel, Edward L. Genn, shows the total of fees chargeable to Sankin to be $117,300.00. Counsel for Benn in answer to Sankin's motion for an award of attorneys' fees state that Benn "does not challenge * * * that able counsel for the plaintiff is not entitled to the fee he claims." Rather Benn argues that "the Court should let the parties pick up their own pieces, and pay their own expenses." But in this case the pieces to be picked up were strewn about by Benn's fraud as well as Garfield's. And the expenses incurred by Sankin resulted from the fraud of both. However, Benn contends that to award through punitive damages an additional sum for attorneys' fees against him but not Garfield would be to apportion punitive damages; and that punitive damages may not be apportioned.

There is a division among the several jurisdictions which have ruled on the matter of apportioning exemplary damages where more than one defendant has been found guilty of malicious action in committing a tort. Some courts permit the awarding of such damage against one or more tort feasors and not against another. Other Courts hold that there can be no such apportionment where several defendants are sued jointly. See 62 A.L.R. 239; 9 A.L.R.3rd 695–702; 22 Am.Jur.2d, Damages, § 262, pp. 356–357. No case of this Court or of the Court of Appeals for this Circuit which deals with this subject has been brought to my attention and I have found none. However, the Supreme Court in a case arising in the District of Columbia has held that the financial worth of one of three defendants was inadmissible where the libeled plaintiff sought both compensatory and punitive damages. In that case the Court reversed as to two defendants and remanded for a new trial as to the remaining defendant. And while the question of whether punitive damages could be apportioned was not directly before the Court, the opinion indicates that they could not be. Washington Gas Light Co. v. Lansden, 172 U.S. 534, 551–554, 19 S.Ct. 296, 43 L.Ed. 543 (1899).

██ No judgment will be entered in favor of Sankin and against Benn and 5410 for attorneys' fees in the form of punitive damages since none can be awarded against Garfield in view of his settlement with Sankin in March 1960. Sankin's motion for attorneys' fees will be denied.

 However, to refuse to grant attorneys' fees is not to reject Sankin's prayer for punitive damages. As has been indicated throughout this opinion, the conduct of Garfield, Benn and 5410 has been unconscionable. It deserves punishment; such conduct must be deterred. With an intent to accomplish those purposes I will award $30,000.00 punitive damages in favor of Sankin and against Garfield, Benn and 5410. There can be no doubt that punitive damages may be assessed against 5410 Connecticut Avenue Corporation. At the time of its grossly fraudulent conduct, along with that of Garfield and Benn, the latter as its president and only stockholder, was "actually wielding the whole executive power" of 5410. Benn was thus so far representing the corporation and identified with it, that his wanton, malicious and oppressive intent, in doing the fraudulent acts in behalf of the corporation as well as of himself, is to be treated as the intent of the corporation itself. Lake Shore, etc. Railway Co. v. Prentice, 147 U.S. 101, 114, 13 S.Ct. 261, 37 L.Ed. 97 (1893).

██ Sankin's motion and prayer for punitive damages are granted in the sum

of $30,000.00 against defendants Garfield, Benn and 5410.

 A third motion before the Court is Sankin's motion for costs and fees. This motion is premature. It sets forth certain amounts Sankin asserts he was obligated to pay. The motion purportedly supports in part some of those expenditures. However, it seeks a judgment for " * * * such further costs as may have been or may hereafter be incurred * * *."

Also Sankin's motion for costs includes the $3,500.00 attorneys' fees awarded The Riggs National Bank on March 14, 1960. With those fees I have already dealt.

Sankin's motion for costs and fees will be denied without prejudice. At the appropriate time the matter of costs will be acted upon. See Rule 54(d), F.R.Civ. P., Perlman v. Feldmann, 116 F.Supp. 102, 111 (D.Conn.1953); Hansen v. Bradley, 114 F.Supp. 382, 387 (D.Md. 1953); Syracuse Broadcasting Corporation v. Newhouse, 32 F.R.D. 29 (N.D. N.Y. 1963). See also Farmer v. Arabian American Oil Co., 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964); Association of Western Railways v. Riss and Company, 116 U.S.App.D.C. 63, 320 F.2d 785 (1963).

### IX *Permanent Injunction*

 Sankin in filing this action also sought injunctive relief. A preliminary injunction was entered on June 8, 1959, by the terms of which the defendants and all persons[22] in active concert with them were restrained from selling, transferring, pledging, disposing of, registering on the records of Garfield and Sankin, Inc. and Julius Sankin, Inc. or affecting in any way or manner the 66⅔ shares of stock in Julius Sankin, Inc. and 66⅔ shares of stock in Julius Sankin, Inc. which Sankin had purchased from Garfield on May 26, 1959. That preliminary injunction has continued in effect since it was issued.

22. At the time the preliminary injunction was issued Benn had been named as a defendant but the summons and complaint had not been served upon him.

This case having now been tried on its merits and this Court having decided it as set forth in this opinion, a permanent injunction will be made a part of the final judgment and decree. That injunction will not only permanently continue the restraints of the preliminary injunction, but it will also enjoin the defendants and all persons acting in concert with them from in any way interfering with or making claim to any interest in Garfield and Sankin, Inc. and Julius Sankin, Inc.